[S.F. No. 22779. In Bank. Apr. 28, 1971.]

MANUELA RAMOS, a Minor, etc., et al., Plaintiffs and Appellants, v. COUNTY OF MADERA et al., Defendants and Respondents.

## COUNSEL

Ralph Santiago Abascal, Dennis R. Powell, Maurice Jourdane, J. V. Henry, Don B. Kates, Jr., and Martin Spiegel for Plaintiffs and Appellants.

Roy E. Wolfe, County Counsel, and Edward H. Chidlaw for Defendants and Respondents.

## Opinion

**PETERS, J.**—Plaintiffs, recipients of Aid to Families With Dependent Children, and of Aid to the Blind (Welf. & Inst. Code, §§ 11200-11488; 42 U.S.C. § 601 et seq.; Welf. & Inst. Code, §§ 12500-12850), appeal from the judgment of the trial court, which sustained defendants' general demurrer to their complaint without leave to amend on the ground that plaintiffs had not exhausted available administrative remedies. Plaintiffs in their class action seek injunctive and declaratory relief for the class and damages for the individually named plaintiffs.

The allegations of the complaint, which we must assume to be true for purposes of ruling upon a demurrer, may be summarized as follows:

On Saturday, September 16, 1967, it was announced that Madera schools would be closed the following week to enable pupils to assist in the grape harvest. Employees of defendant county welfare department allegedly announced that AFDC welfare recipients of 10 years old or older must work in the fields or have their assistance terminated. Nineteen families were terminated that week for failure to send children into the fields.

Plaintiffs are two families, the Segovias and the Valeros, affected by the department's order.[1] The department's actions toward each family, through two different social workers, were allegedly similar.

On Monday, September 18, defendant social worker Schleich (an agent and employee of the department) allegedly threatened Mrs. Segovia with termination unless she and her four daughters reported to pick grapes. A written threat was allegedly communicated the next day. The family feared termination and decided to work. However, Mrs. Segovia has a disabled arm, and her 15-year-old daughter, Armandina, is mentally retarded, and cannot work without close parental supervision. These two therefore stayed home. Three other Segovia daughters, aged 10, 11, and 17, went to the field, accompanied by their stepfather, a recipient of Aid to the Blind, who feared for their safety.

---

[1] The Segovia family consisted of Trinidad Segovia, aged 45, her four daughters from two previous marriages (Amelia and Yolanda Williams, ages 10 and 11, Armandina and Manuela Ramos, ages 15 and 17), and Jesus Segovia, also aged 45, the girls' stepfather and a recipient of entitlements under the Aid to the Blind program (Welf. & Inst. Code, §§ 12500-12850). The Valero family consisted of Manuela Valero, aged 59, and her three grandchildren Richard, Juanita, and Gloria Vega (aged 11, 14, and 16, respectively). All of the children regularly attend school. The Ramos and Williams children received AFDC entitlements because of the death and desertion of their respective fathers, the Vega children because of parental abandonment. (Welf. & Inst. Code, §§ 11250, subds. (a) and (b).)

The Segovias worked in a field under the auspices of Mr. Contrares, a labor contractor to whom they had been referred by Schleich. In the field there was allegedly no toilet, no place to wash one's hands and no first aid kit. The drinking water available was in an aluminum can without a cover. Two or three used beer cans were used by all the workers as drinking cups.

None of the children had work permits nor had they been told that they must have them to obtain work.

That same afternoon Schleich allegedly came to the house and told Mrs. Segovia that her disabled arm was an insufficient excuse for not working and that she would be terminated unless she worked. On Thursday and Friday, therefore, all but the mentally retarded child went to the fields. On Thursday, September 21, Schleich allegedly phoned the home, found Armandina there, and so verbally assaulted her that she was still emotionally distraught when the family returned that evening.

On Friday, Schleich allegedly called again at 2 p.m. Upon being told the family had not sought further employment that last day of the harvest, when their jobs were finished at 11:30 a.m., he heaped verbal abuse on Mrs. Segovia, causing her severe distress, and then terminated the family's welfare payments.

Similarly, on Monday, September 18, an unnamed defendant welfare worker allegedly threatened Mrs. Valero, her grandson, and two granddaughters with termination unless all the children, including the 11-year-old grandson, worked in the grape harvest. The social worker referred her to Mr. Contrares as a means of getting work. After further threats on Tuesday, in which the social worker would accept no excuses, Mrs. Valero sent the children, aged 11, 14, and 16, to the fields with friends.[2] None of the children had work permits, nor had they been told to get them. They worked that Wednesday morning. After lunch Richard, the youngest, allegedly got very pale, vomited, and had to lie down for the rest of the afternoon. Gloria, the eldest, allegedly went to bed immediately upon their return from the field with nerve spasms in her side. On Thursday, September 21, the department allegedly terminated the family's aid payments because these two children refused further employment in the fields. The letter of termination, issued over the name of defendant Mabey, di-

---

[2] It is not clear whether or not the Valero children worked in the same field that Wednesday as did the Segovia children. Like the Segovias, the Valeros were referred to Mr. Contrares, a labor contractor. Mrs. Valero refused to let the children go on his bus, however, and said "I did find some friends who were going . . . ." These friends may have gone to the same field. In any event, the field conditions under which any plaintiff worked may be shown at trial.

rector of the department, stated that aid was terminated because "several of your children over 10 years of age were not working."

Plaintiffs requested fair hearings appealing termination of their welfare benefits. (Welf. & Inst. Code, § 10950.) The Valero family also asked in their hearing request for consequential damages suffered by the minor children from working in the fields. Both families also filed damage claims with the county and department. These claims were rejected.

This action, seeking injunctive and declaratory relief for the class of minors wrongfully coerced to work, and damages for the individually named plaintiffs, was filed before decisions were rendered in the fair hearings.[3]

The trial court sustained defendants' general demurrer without leave to amend on the sole ground that plaintiffs had not exhausted their administrative remedies. Although the complaint stated causes of actions for class relief and for individual damages, the court declared that plaintiffs could not "thereby circumvent the required administrative procedure." We have concluded that the trial court erred and that plaintiffs have stated a cause of action.

Section 10950 of the Welfare & Institutions Code provides in full: "If any applicant for or recipient of public social services is dissatisfied with any action of the county department relating to his application for or receipt of aid or services, or if his application is not acted upon with reasonable promptness, or if any person who desires to apply for such aid or services is refused the opportunity to submit a signed application therefor, and is dissatisfied with such refusal, he shall, in person or through an authorized representative, without the necessity of filing a claim with the board of supervisors, upon filing a request with the department, be accorded an opportunity for a fair hearing. [¶] As used in this chapter, 'recipient' means an applicant for or recipient of aid or services except aid or services exclusively financed by county funds."

The entire fair hearing scheme is premised on an individualized treatment of claims for aid. Each individual theoretically has different needs, and his claim for aid would be treated separately. In no section of this chapter (Welf. & Inst. Code, §§ 10950-10965) is there provision for class relief. It is the *individual* who must apply for a hearing, regarding *his* application for or receipt of aid. He must do so in person or through an *authorized*

---

[3] Damages were sought for the verbal abuse inflicted on Armandina Ramos and her mother, Trinidad Segovia; for injuries suffered by Richard and Gloria Vega in the field; and, for all the other minor plaintiffs, nominal damages. Damages were also sought for Manuela Valero and Jesus Segovia.

representative. ■ It is clear that the hearing scheme established by the Legislature does not contemplate class actions.

■ There was therefore no failure to exhaust an administrative *remedy* for class relief, for no such administrative remedy existed.[4] "The rule that a party must exhaust his administrative remedies prior to seeking relief in the courts 'has no application in a situation where an administrative remedy is unavailable or inadequate.' (*Martino* v. *Concord Community Hospital Dist.* (1965) 233 Cal.App.2d 51, 56 . . . .)" (*Diaz* v. *Quitoriano,* 268 Cal.App.2d 807, 812 [74 Cal.Rptr. 358].)[5]

■ For similar reasons there was no failure to exhaust administrative remedies in seeking damages from the county or the department. Plaintiffs did file damage claims with these agencies. The claims were rejected. There is no provision in the Welfare and Institutions Code for claiming damages in tort through the fair hearing system. The only remedies envisioned by the fair hearing system are grants of aid and/or services. (Welf. & Inst. Code, §§ 10957, 10961.) Again there was no failure to exhaust an administrative *remedy;* none existed.

■ We thus reach the merits of the complaint. In brief summary, the complaint alleges that defendant public entities and their agent employees committed tortious acts which proximately caused the damages sustained by plaintiffs, and that defendants are liable to plaintiffs in the amounts claimed. The tortious acts complained of consist of coercing plaintiffs to work as a condition to receiving AFDC payments, contrary to state-imposed standards of eligibility for aid, contrary to state statutes governing working

---

[4]It bears emphasis that we are not here confronted by a highly individualistic claim applicable only to a theoretically constructed class. Plaintiffs sued not only for themselves but for a total of 19 families similarly situated.

[5]The trial court rendered its judgment of dismissal on September 3, 1968. On January 27, 1969, the referee in the Valero fair hearing filed his decision. Although all his findings of fact applied solely to the Valero family, the referee's order stated in part that "Madera County shall not in the future refer children to farm labor who are under 16 years of age as a requirement for AFDC." Given the individualized nature of the hearing process, the binding effect of such an order on the county welfare department is questionable. As noted in *Diaz* v. *Quitoriano, supra,* 268 Cal.App.2d 807, 812, "[i]n describing the relief which the Department may grant, the code makes no mention of relief to a class. Sections 10957 and 10961 refer merely to decisions by the department that a particular applicant is entitled to services or financial aid. Section 10963 requires the county welfare director to 'comply with and execute' such decisions, but they have no binding effect on the rights of future applicants. [Citations.] . . ." Therefore we do not believe that the fair hearing decision moots plaintiffs' class action for injunctive relief. "Threat of future action can only be inferred from that which occurred in the past. And if such past actions were illegal, and circumstances show that they are likely to reoccur, injunction (or mandate) is a proper remedy. . . ." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 286 [32 Cal.Rptr. 830, 384 P.2d 158].)

conditions in agriculture, and contrary to state child labor laws. It is not disputed that the injuries allegedly sustained were a foreseeable result of the alleged tortious coercion.

■ We must begin with the well-settled notion that in governmental tort cases "the rule is liability, immunity is the exception." (*Muskopf* v. *Corning Hospital Dist.,* 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457].) "[I]t would be unjust in some circumstances to require an individual injured by official wrongdoing to bear the burden of his loss rather than distribute it throughout the community." (*Lipman* v. *Brisbane Elementary Sch. Dist.,* 55 Cal.2d 224, 230 [11 Cal.Rptr. 97, 359 P.2d 465].) "Accordingly, courts should not casually decree governmental immunity; . . ." (*Johnson* v. *State of California,* 69 Cal.2d 782, 798 [73 Cal.Rptr. 240, 447 P.2d 352].) Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail.

Defendants urge that their demurrer to the damage actions should be sustained because the alleged acts complained of were the result of the exercise of discretion vested in the department and its employees to determine eligibility for aid.[6] If such a contention were sound, the individual defendants would be immune from suit. (Gov. Code, § 820.2.)

Defendants' contention that they had "discretion" to determine eligibility for aid, and the further contention that they acted in the exercise of such discretion,[7] must be considered in light of our construction of section 820.2 in *Johnson* v. *State of California, supra,* 69 Cal.2d 782.

In *Johnson* we reviewed the semantic quicksand which had ensnared the concept of "discretion" in an unyielding trap of incomprehensibility. We

[6]Defendants' general demurrer to the complaint alleged first that the trial court did not have jurisdiction and second that the complaint did not plead facts sufficient to state a cause of action. In their memorandum of points and authorities defendants relied upon the same theory of law for both grounds of the general demurrer, namely, that plaintiffs had not exhausted their administrative remedies. The trial court sustained the demurrer on the first ground (lack of jurisdiction) and expressly found it unnecessary to consider other grounds specified in the demurrer. We hold that plaintiffs did not fail to exhaust administrative remedies. However, "[i]f a complaint is insufficient on any ground properly specified in a demurrer, an order sustaining the demurrer must be upheld even though the particular ground upon which the court sustained it may be untenable. . . ." (*Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13, 20 [51 Cal.Rptr. 881, 415 P.2d 769].)

[7]The actor must not only have discretion but also must act in the exercise of that discretion. "Immunity for 'discretionary' activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision . . . took place. . . ." (*Johnson* v. *State of California, supra,* 69 Cal.2d 782, 794, fn. 8.)

noted that discretionary acts have been defined as "those wherein there is no hard and fast rule as to the course of conduct that one must or must not take . . . ." (*Elder* v. *Anderson,* 205 Cal.App.2d 326, 331 [23 Cal.Rptr. 48].)[8]

Finding the semantic distinctions between "discretionary" and "ministerial" inadequate as a method of deciding actual controversies, we followed our landmark precedent of *Lipman* v. *Brisbane Elementary Sch. Dist., supra,* 55 Cal.2d 224, in concentrating on policy considerations relevant to the governmental claim of immunity. Discretionary activity, we held, is that related to basic policy decisions, or that activity sometimes characterized as the "planning" as opposed to the "operational" level of decision-making. (69 Cal.2d at pp. 793-794.) Applying these concepts to the Youth Authority in *Johnson,* we noted the great policy making power committed to that agency's discretion, yet held that a parole officer has no *discretion* to decide what information to disclose or not to disclose to prospective foster parents of a paroled youth. Stating that " '[i]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail' (*Ham* v. *County of Los Angeles* (1920) 46 Cal.App. 148, 162 [189 P. 462])," we concluded that "to the extent that a parole officer consciously considers pros and cons in deciding what information, if any, should be given, he makes such a determination at the lowest, ministerial rung of official action." (69 Cal.2d at pp. 788, 795-796; see also *Connelly* v. *State of California,* 3 Cal.App.3d 744, 751 [84 Cal.Rptr. 257] (decision to issue flood forecasts discretionary, but performance of forecasting job not); *Elton* v. *County of Orange,* 3 Cal. App.3d 1053, 1058 [84 Cal.Rptr. 27] (probation department vested with discretion to decide who is a dependent child, but no discretion not to enforce regulations of the department of social welfare).)

When defendants' claim of discretionary immunity for county welfare department officials and employees is considered in light of this precedent, it is immediately apparent that the claim must fail. ■ The Welfare and Institutions Code clearly provides that eligibility standards for AFDC are to be determined at the state level, and that counties have the purely ministerial duty of carrying out those decisions. Section 11207 provides: "Every county *shall* grant aid to any child eligible therefor, . . . ." (Italics added.) Section 11250 sets forth eligibility standards, providing that aid

---

[8] See also Van Alstyne, *Governmental Tort Liability: A Decade of Change,* 1966 U.Ill.L.Forum 919, 975: "[T]he presence of discretion and judgment as elements in the decisional process necessarily implies choice between alternatives which are equally defensible as rational conclusions drawn from good faith evaluation of competing arguments and policies."

"*shall* be granted . . . subject to the regulations of the department, to families with related children under the age of 18 years, except as provided in Section 11253,[9] in need thereof because they have been deprived of parental support or care due to: [causes not at issue here] . . . ." (Italics added.)

Section 11209, considered with section 11250, makes it clear that eligibility is to be determined solely by statute and departmental regulations issued at the *state level:* "The department shall: (a) make rules and regulations for the proper maintenance and care of needy children; (b) make rules and regulations for the administration of aid to families with dependent children. *Such rules and regulations shall be binding upon the institutions and counties.* . . ." (Italics added.) ■ As stated in *Bd. of Soc. Welfare* v. *County of L. A.,* 27 Cal.2d 81, 85 [162 P.2d 630], it is "the mandatory duty of the county to furnish aid according to the plan . . . laid down by the applicable provisions of the Welfare and Institutions Code."

■ It is true that the county and its agents must exercise *some* powers of judgment in determining whether an applicant or recipient meets the eligibility standards established by the Legislature and State Department of Social Welfare. But this judgment is exceedingly limited. Where, for example, a child under 18 years of age has been deprived of parental support or care for one of the reasons specified in Welfare and Institutions Code section 11250 (and where any such child over the age of 16 is regularly attending school or a training program, or is disabled), the county and its agents have *no* discretion to require such children to seek employment. ■ This basic policy decision—whether or not able-bodied minors must be unemployed and willing to work as a condition to receiving aid— has been made by the Legislature (and by Congress; see 42 U.S.C. § 601 et seq.).

Given the role assigned to counties by the Legislature in the AFDC program and the clear and unambiguous standards of eligibility for aid established by the Legislature, it is impossible to conclude, assuming the allegations of the complaint to be true, that any of the defendant employees exercised "discretion vested in him" so as to gain immunity pursuant to section 820.2 of the Government Code. (*Johnson* v. *State of California, supra,* 69 Cal.2d 782, 793; *Lipman* v. *Brisbane Elementary Sch. Dist.,*

---

[9]Section 11253 provides that children *over* the age of 16 are to be granted aid if "regularly attending school" or a training program; or are disabled; or are employed and using their earnings in specified fashion. No such qualification on the right to aid applies to children under the age of 16. A child attending school or a training program is to receive aid until the age of 21. (*Id.*)

*supra,* 55 Cal.2d 224, 234.) ▮▮▮ The authority given counties to implement the basic policy decisions of the Legislature, as here (and where delegated of the Department of Social Welfare), is purely ministerial. (Cf. *Elton* v. *County of Orange, supra,* 3 Cal.App.3d 1053, 1058.) Such authority does not extend to the alleged imposition of radically different standards of eligibility on persons otherwise entitled to aid. Nor does it extend to the alleged harassment and excoriation of a 15-year-old, mentally retarded child. To characterize such alleged action as a mere "abuse of discretion" is worse than a euphemism; it would permit brutal and wholly unauthorized coercion inflicted under color of law.

Section 815.2, subdivision (a), of the Government Code provides that a public entity is liable for injuries caused by an employee "within the scope of his employment" if the act or omission would have given, rise to a cause of action against the employee. Assuming that the individual defendants herein would be liable if the allegations of the complaint are true, defendant public entities would also be liable for tortious acts within the scope of the individuals' employment.[10]

Moreover, even if we were to assume that under the Welfare and Institutions Code the defendants had discretion to establish requirements for eligibility in addition to those set forth in the code and by the department's regulations, plaintiffs have alleged sufficient facts to state a cause of action under section 815.6 of the Government Code. The section provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The Law Revision Commission's comment to this section points out that the section declares the familiar rule that failure to comply with applicable statutory or regulatory standards is negligence unless reasonable diligence has been exercised to comply with those standards. (Cf. *Lehmann* v. *L. A. City Board of Education,* 154 Cal.App.2d 256 [316 P.2d 55].)

▮▮▮ We are satisfied that a public entity may be liable in tort pursuant to Government Code section 815.6, where it knows or should know that its failure to exercise its duty to reasonably supervise employees will result

---

[10]The individual defendant is entitled to full indemnification from the public entity if the tort was committed within the scope of his employment (Gov. Code, § 825), unless actual fraud, corruption, or malice is shown. (Gov. Code, § 825.6.)

in coercing others to violate state laws, and where such violation proximately results in an injury of the kind which the law was designed to prevent. ▮ Public entities have, inter alia, a mandatory duty to obey legislative enactments, of which the entities must conclusively be presumed to have knowledge. ▮ Public entities certainly have a mandatory duty not to coerce others—either by force or by a threatened withdrawal of life-sustaining aid—to *violate* state laws, whether or not the entity is specifically charged with enforcing that particular law. ▮ Nor does any employee have "discretion" to coerce California citizens to break the law.[11]

Article 2 of the Labor Code, section 1290 et seq., forbids the employment of minors under the age of 16 by any business or place of employment, subject to certain statutory exceptions. No statute whatsoever purports or could possibly be construed to grant an exception to minors under the age of 12 for agricultural work.[12] The child labor laws, strictly regulating the conditions under which minors may work, are clearly designed to protect minors against the risk of injuries generally associated with child labor, such as overwork and exposure to dangerous, immoral, or unhealthful conditions. Defendants allegedly ordered 10-year-olds to work. Certainly they knew or should have known the ages of AFDC recipients. The injury allegedly suffered by 11-year-old Richard Vega, who turned pale, vomited, and was forced to rest for the remainder of the afternoon, was exactly the kind of injury sought to be avoided by the child labor laws. ▮ Unless defendant public entities show that they exercised reasonable diligence to assure that children under the age of 12 would *not* be forced to work, they are manifestly liable for proximately caused injuries pursuant to section 815.6 of the Government Code. (Cf. *Lipman* v. *Brisbane Elementary Sch. Dist.*, *supra*, 55 Cal.2d 224, 234.)[13]

---

[11]Even under the vague, malleable definitions of discretion which we have now discarded, it could hardly be said that the public entity or employee had "no hard and fast rule" to follow (*Elder* v. *Anderson, supra*, 205 Cal.App.2d 326, 331), or was faced with "alternatives which are equally defensible" (Van Alstyne, *supra*, 1966 U.Ill.L. Forum 919, 975), when confronted by a clear, controlling state law.

[12]Minors over the age of 12 may in certain circumstances obtain work permits. (Ed. Code, §§ 12251-12258.) It would also appear that minor males over the age of 10 may be permitted to work in certain "street" occupations such as newspaper-selling and bootblacking. (Lab. Code, § 1298.) Labor Code section 1394, subdivision (b), provides a general exception to section 1290 for minors in agricultural employment who are working under parental supervision on land controlled by the parent, a situation not relevant in the case at bar.

[13]Liability under section 815.6 of the Government Code might also be posited on the basis of other statutory violations.

The complaint alleges that defendants coerced minor petitioners to work without work permits. For minors between the ages of 12 and 16 California has provided an

Our central concern must be "the control of official power, particularly the protection of the individual from its improper use . . . on deliberate rather than negligent conduct, on misuse of power rather than inadvertent miscalculation." (Jaffe, Judicial Control of Administrative Action (1965) at p. 236.) In *Johnson* v. *State of California, supra,* 69 Cal.2d 782, 792, we declared that any deterrent effect on official zeal that our decision might have "may be wholesome." If the facts alleged in plaintiffs' complaint are true, that phrase has proven to be a prophetic understatement. Of course, we do not know whether plaintiffs will be able to prove their allegations at trial.

Defendants demurred specially as well as generally to plaintiffs' complaint. The trial court sustained the general demurrer without leave to amend, expressly finding it unnecessary to rule upon the points presented by the special demurrer.

The judgment is reversed and the cause is remanded to the trial court

intricate system of work permits (Ed. Code, §§ 12251-12307, 12451-12460) designed to ensure close supervision of employment of minors. At the time of the incidents alleged herein, no permit to work or vacation permit could be issued legally unless and until the minor and his parent appeared personally to apply for it (*id.,* § 12260), the prospective employer furnished a written statement stating the nature of the job awaiting the named minor (id., § 12261, subd. (c)), and a doctor signed a certificate stating that the minor had been "thoroughly examined" by him and was physically fit to pursue the work specified. (*Id.,* § 12261, subd. (d).) All permits to work are subject to cancellation at any time that any one of various specified public officers finds that the employment is impairing the health or education of the minor or that any provision or condition of the permit is being violated. (*Id.,* § 12267.) Violation of the work permit laws by either parent or employer is a misdemeanor. (*Id.,* §§ 12454, 12455.)

Defendants must of course be deemed to have known of these requirements. It would be a question of fact at trial whether their announcement on a Saturday of work required on Monday, plus enforcement of that policy, served to coerce affected minors to work without the requisite permit, and whether respondents knew or should have known that their actions would have this effect.

Similarly, the complaint alleges that the fields in which some of the plaintiffs worked had conditions violative of several Health and Safety Code sections and that defendants knew or in the exercise of due care should have known of the violations. Thus the field in which Manuela Ramos worked allegedly had no toilet or place to wash one's hands, contrary to Health and Safety Code section 5474.23. The water can allegedly had neither a cover to prevent dipping, nor a faucet, but rather two or three used beer cans used as common drinking cups, contrary to Health and Safety Code section 3702. These laws are designed to prevent the transmission of communicable diseases among employees (*Parkhurst* v. *Industrial Acc. Com.,* 20 Cal.2d 826, 830 [129 P.2d 113]) and to further the state's "primary interest in the sanitary conditions under which food crops are grown and harvested for human consumption . . . ." (Health & Saf. Code, § 5474.20.) Violation of these provisions is a misdemeanor (Health & Saf. Code, §§ 3704, 5474.31), and the Division of Farm Labor Service is prohibited from referring persons to employers who contravene section 5474.23. (§ 5474.30.)

with directions to overrule the general demurrer and to rule upon the points presented by the special demurrer.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.