[No. B150973. Second Dist., Div. Four. Dec. 26, 2002.]

DEBRA SMITH et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY BOARD OF SUPERVISORS et al.,
Defendants and Respondents.

**COUNSEL**

Legal Aid Foundation of Los Angeles, Yolanda Arias, Silvia Argueta; Western Center on Law & Poverty, Robert D. Newman, Richard A. Rothschild; San Fernando Valley Neighborhood Legal Services, Kate Meiss, Dora Lopez; ACLU Foundation of Southern California, Dan Tokaji and Mark Rosenbaum for Plaintiffs and Appellants.

Lloyd W. Pellman, County Counsel, Leela A. Kapur, Assistant County Counsel, Anita D. Lee and Nina J. Webster, Principal Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**EPSTEIN, Acting P. J.**—Plaintiffs challenge a pilot program in Los Angeles County that makes a home visit a condition of eligibility for CalWORKs

benefits. They contend the county has created an unauthorized condition; the pilot project violates the requirements for early fraud prevention and detection programs; the home searches conducted pursuant to the program violate state and federal constitutional requirements for welfare-related home searches or administrative searches; the policy imposes unconstitutional conditions on the receipt of welfare benefits; and it violates the right to privacy guaranteed by article I, section 1 of the California Constitution.

We find neither a constitutional violation nor a conflict between the home visit pilot program and the CalWORKs statutory and regulatory scheme. We affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY

"In 1996, the federal government enacted what is known as the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 42 United States Code (U.S.C.) section 602 et seq., which authorized funding to states for welfare-to-work programs. PRWORA replaced two federally funded welfare programs, Aid to Families with Dependent Children (AFDC), which provided monetary assistance to eligible families, and Job Opportunity and Basic Skills (JOBS), which provided employment assistance to adults in families that were receiving AFDC benefits. In California, the JOBS program was known as GAIN. [¶] In 1997, the California Legislature implemented PRWORA by amending [Welfare and Institutions Code[1]] section 11200 et seq. and replacing California's AFDC and GAIN programs with the California Work Opportunity and Responsibility to Kids Act (CalWORKS). CalWORKS consists of two welfare services: (1) cash aid to parents and children and (2) the welfare-to-work program, which seeks to end families' dependence on welfare. [¶] The CalWORKS program took effect on January 1, 1998." (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 212-213 [123 Cal.Rptr.2d 735].)

The CalWORKs program is administered by the counties under the supervision of the State Department of Social Services (DSS). (§§ 10550, 10600.) Section 11050 provides that the state is responsible "for maintaining uniformity in the public social service programs . . . ." DSS adopted regulations and standards to implement the program. These appear in the manual of policies and procedures (MPP); they are not included in the California Code of Regulations. (§ 10554.) Section 40-101 of the MPP sets out the general policies and principles.

Section 11055 of the statute provides: "The county shall promptly investigate all applications for public assistance as prescribed by the regulations

---

[1]All statutory references are to this code unless otherwise indicated.

of the department." MPP section 40-101.17 provides: "Applications for public assistance are to be reviewed promptly *in accord with regulations prescribed by the State Department of Social Services . . . .*" Section 11209 provides that the rules and regulations are binding on the county welfare departments. Under the MPP, each county is obligated to establish special investigative units (SIU's) for the purpose of investigating suspected welfare fraud, particularly during intake. (MPP §§ 20-007.1, 20-007.31.) The SIU is to be a separate organization "independent of organizations performing eligibility and benefit determination functions." (MPP § 20-007.21.)

The MPP provides that the SIU is to "[c]onduct all investigations in compliance with due process of law and so as not to infringe upon the constitutional rights of applicants/recipients. Home visits for the purposes of investigation may be made during reasonable hours of normal family activity. Mass or indiscriminate home visits are prohibited. . . . Search of premises or removal of physical items of evidence of fraud is prohibited without a valid legal process or the permission of the applicant or recipient upon full appraisal of the applicant's or recipient's rights." (MPP § 20-007.33.)

Section 40-161 of the MPP also addresses home visits: "A home visit prior to approval of aid . . . is required when living arrangements or other factors affecting eligibility, or apparent eligibility in cases of immediate need or diversion, cannot be satisfactorily determined without such a visit."

In February 1999, following a television broadcast about welfare fraud in Los Angeles County, the board of supervisors instructed the Director of the Los Angeles County Department of Public Social Services (DPSS) to report on the feasibility of implementing a home call visitation program. The program was for the dual purposes of eliminating welfare fraud and identifying additional services that can help with family needs. After DPSS reported that such a project was feasible, in April 1999, the board of supervisors voted to implement a program of home visits on a pilot basis. The minutes of the meeting show that the supervisors intended that a successful program in San Diego County be used as the model.

The 1998-1999 Los Angeles County Grand Jury issued a report on welfare fraud. It examined Project 100 in San Diego County, which employed field calls to the residence of every applicant as a method to verify eligibility. Based on that examination, the grand jury recommended that the board of supervisors direct DPSS "to implement a pilot project in one District office, based on San Diego's Project 100 in order to step up identification of applicants providing false information and deny aid before benefits are

issued. After a six-month trial, report back to the Board of Supervisors with the results of the pilot project."

On September 15, 1999, DPSS implemented its home call visitation program in four district offices covering the five supervisorial districts. The program was developed jointly by the district attorney's office and DPSS, and was approved by county counsel and the chief administrative office. The program called for home visits to all potentially eligible CalWORKs applicants. The purpose of the home visits was "to complete the eligibility determination process by verifying information provided by all new applicants prior to granting CalWORKs benefits, as well as to assess and discuss the family's need for supportive services, child care, training/education services, literacy training needs, and expedite the family's access to these services as appropriate."

The background section of the pilot program noted that both the television program and the grand jury report had generated interest in a home call visitation program. Detailed home visit guidelines were to be developed. The initial program provides: "As part of the home visit, the [eligibility worker] will request the applicant to accompany him/her on a *non-intrusive walk-through of the home to verify information obtained during the initial intake interview*, see if the child(ren) are living in a safe and healthy environment, and assess service needs that may be addressed by program resources. The [eligibility worker] will not open drawers or closets." (Italics added.) Shirley Christensen, the director of the welfare fraud prevention and investigation section of the DPSS, provided a declaration in support of the county. She explained that where an early fraud investigation concludes an applicant has submitted a fraudulent application for CalWORKs benefits, the application is denied but the applicant is not referred for prosecution.

If the eligibility worker is unable to conduct a home visit after two attempts, failure by the applicant to contact the worker within two work days of the second missed visit "will result in the denial of cash aid." "A third missed appointment will result in the denial of cash aid." Applicants were to be notified of the home visit program by posters in district lobbies and through notices given and discussed at the initial intake interview. "Each applicant will be asked to sign a notice acknowledging that a home visit, which includes a walk-through of the home, will be made. Failure to consent to the home visit will result in the denial of aid."

Applicants were told that the home visit would be made within 10 days of his or her return visit to the district office, and that "every effort will be made to conduct the home call so as not to interfere with his/her employment/ training/education activities." Exceptions to the mandatory home visits were made for applicants residing in domestic violence shelters or

substance abuse treatment facilities, the homeless, applicants working and away from the home Monday through Friday, from 8:00 a.m. to 5:00 p.m., and applicants living with a nonrelative who refused to allow the home visit.

Eligibility workers conducting the home visits were given two weeks of training, including training by persons involved in the San Diego program. The training included instruction on what to look for in identifying potential fraud, "just looking for the obvious things that are just right out in front of you."

DPSS prepared a report on the home call visitation pilot program in August 2000, covering the period between September 15, 1999, through March 2000. During that period, 7,278 home visits were made to 4,813 households, with additional second and third visits. Under the program, 374 cases "were denied benefits due to the results of early fraud referrals, unsuccessful home call visits, or other reasons." Where there were unsuccessful home visits, approximately 25 percent subsequently reapplied and were granted cash assistance. One hundred seventy applicants were denied aid because they were not home for second or third visits.

On September 14, 1999, Debra Smith, Alma Roe and Laura Bergantino filed a petition for writ of mandate challenging the home call visitation pilot project. They alleged violations of the California Constitution, statutes, and regulations. Smith and Bergantino are recipients of CalWORKs aid; Roe is an applicant for such benefits. Named as defendants were the Los Angeles County Board of Supervisors, DPSS, and Lynn Bayer, in her capacity as Director of DPSS. A first amended petition for writ of mandate and complaint for injunctive and declaratory relief was filed in December 1999. It added a new plaintiff, Maria Quiles, and Bergantino dropped out of the case.

At the beginning of the court trial, plaintiffs dismissed with prejudice all causes of action except for taxpayer claims under Code of Civil Procedure section 526a. The evidence presented was a combination of declarations, deposition excerpts, and the testimony of six witnesses at trial.

The trial court issued a statement of decision in April 2001, ruling for respondent county. The court found that home visits were completed, on average, in 30-45 minutes, with the walk-through inspection usually taking one to two minutes. If the eligibility worker found facts during the home visit inconsistent with the application for benefits, the application was denied and referred to the DPSS early fraud unit. If the inconsistency was substantiated, the application was denied, although an applicant could reapply or request an administrative hearing to challenge the denial of benefits.

The court cited calculations by a county economist that savings of $4.3 million were realized through the home call visitation program by not paying CalWORKs benefits to ineligible applicants. The pilot program identified 120 cases (2.5 percent of applicants visited) in which conditions of ineligibility were found resulting in denial of the application. Petitioners disputed these calculations, but both sides agreed there was a "significant" saving of welfare funds.

The trial court found the home call program does not violate state regulations. A tabulation of the reasons that 120 cases were rejected for benefits, based on information revealed in the home visits, supported the county's contention that home visits are an effective means to confirm the representations provided on the application, and to discover inconsistencies. The court ruled that petitioners had failed to offer persuasive evidence of other methods to discover such inconsistencies, particularly those related to incorrect address information or the presence of an undisclosed adult in the home.

Counsel for petitioners conceded at trial that home visits could be effective to discover the following ineligibility factors: "absent parent or other unreported adult in the home"; "aided child not in the home"; "applicant not living at listed address"; and "person living beyond what appears to be their means." The trial court characterized petitioners' argument as being "not that home visits are ineffective as an investigative tool, but that the home visits discovered fraud in only a small percentage of cases."

The trial court concluded that home visits are an effective and superior means to discover welfare ineligibility quickly, and hence allowed by MPP section 40-161. The trial court found it significant that the DSS reviewed the home call visitation program and found no violation of MPP section 40-161 or any other rule. The court also cited evidence from Bruce Wagstaff, deputy director of the DSS, that in the past, home visits had been the norm in the eligibility process.

The court rejected petitioners' reliance on MPP section 20-077.33, which provides that "[m]ass or indiscriminate home visits are prohibited." This section in the part of the manual governing fraud investigation procedures by special investigative units, is "a limitation on the manner in which special investigative units may operate. The court does not consider this provision, which is contained in the MPP's voluminous fraud investigation procedures, to limit procedures that are provided elsewhere in the MPP, and specifically in MPP [40-161], for determinations of eligibility for CalWORKs benefits."

The court found that conditioning benefits on a home visit was not intended to deter qualified applicants from seeking CalWORKs benefits nor

has it had that effect. Only eight of the 4,821 applicants asked to consent to a home visit during the pilot project declined to do so. In addition, 25 percent of the 277 applicants originally denied aid because no home visit had been completed reapplied and were approved.

The trial court concluded "that the County's Home Call Visitation Program is permitted by state law because (a) home visits to confirm eligibility are not expressly prohibited by the relevant [State] regulations, (b) the County has adequately demonstrated that home visits are effective in discovering information about eligibility that 'cannot be satisfactorily determined without such a visit' by current or reasonably available eligibility procedures, and (c) the home visits do not significantly burden an applicant's right to receive CalWORKs benefits."

Petitioners' challenge under article I, section 13 of the California Constitution also was rejected. The court ruled that this provision must be interpreted consistently with the United States Supreme Court Fourth Amendment jurisprudence and that *Wyman v. James* (1971) 400 U.S. 309 [91 S.Ct. 381, 27 L.Ed.2d 408] is controlling. That case upheld home visits to recipients of welfare benefits against a challenge that conditioning of benefits on consent to a home visit violated Fourth Amendment rights. Although the trial court found some differences between the New York program upheld in *Wyman v. James* and the pilot program in this case, none were constitutionally significant.

The trial court distinguished *Parrish v. Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d. 223], a case that disapproved early morning entries into the homes of welfare recipients by Alameda County personnel. The entries were made for the purpose of discovering unauthorized males. The court found the program violated the Fourth Amendment. The court concluded that the precedential value of *Parrish* is doubtful in light of the later Supreme Court decision in *Wyman v. James*.

Petitioners' claim that the home visit program violates the California constitutional right to privacy also was rejected. The trial court concluded that in the context of search and seizure, the right to privacy is no broader than the Fourth Amendment, citing *In re York* (1995) 9 Cal.4th 1133 [40 Cal.Rptr.2d 308, 892 P.2d 804]. It also held that CalWORKs applicants have a reduced expectation of privacy.

*Judgment in favor of respondents was entered on April 10, 2001. Petitioners filed a timely notice of appeal.*

## DISCUSSION

### I

■ The judgment in this case was rendered on a petition for ordinary mandamus under Code of Civil Procedure section 1085. " 'In ordinary mandamus proceedings courts exercise very limited review "out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." [Citation.] The court may not weigh the evidence adduced before the administrative agency or substitute its judgment for that of the agency, for to do so would frustrate legislative mandate.' [Citation.] [¶] . . . [¶] . . . This court has held: 'In reviewing the trial court's ruling on a writ of mandate (Code Civ. Proc., § 1085), the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.] However, the appellate court may make its own determination when the case involves resolution of questions of law where the facts are undisputed.' (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352]; *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1217 [85 Cal.Rptr.2d 660].)" (*Redevelopment Agency v. Rados Bros.* (2002) 95 Cal.App.4th 309, 316-317 [115 Cal.Rptr.2d 234].) The *Rados Bros.* court explained: " '[I]n a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law' and thus '[t]rial and appellate courts . . . perform the same function and the trial court's statement of decision has no conclusive effect upon us.' [Citations.]" (*Redevelopment Agency, supra,* at p. 317, fn. 5.)

### II

■ Petitioners argue the home visit program is preempted by state statute and regulations setting eligibility standards for CalWORKs. They also argue the program conflicts with two specific regulations adopted by the DSS relating to home visits.

■ We apply the established principles of preemption analysis. Article XI, section 7 of the California Constitution provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." If a local ordinance or regulation conflicts with state law, it is preempted and is void. (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534].) In determining whether there is a conflict with state law, we consider whether the local legislation " ' " 'duplicates,

contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.]" (*Ibid.*)

 Petitioners argue, in effect, that the home visit pilot program either contradicts general law or encroaches on an area "fully occupied" by the CalWORKs legislation. "[L]ocal legislation is 'contradictory' to general law when it is inimical thereto. [Citation.]" (*Sherwin-Williams Co. v. City of Los Angeles, supra*, 4 Cal.4th at p. 898.)

 Petitioners first argue the home visit program illegally imposes a condition of eligibility not authorized by state statute or regulation. They rely on *Ramos v. County of Madera* (1971) 4 Cal.3d 685 [94 Cal.Rptr. 421, 484 P.2d 93]. In that case AFDC recipients attacked the policy of the Madera County welfare department requiring recipients 10 years old and older to work in the grape harvest or suffer termination of welfare assistance. The plaintiffs contended that this requirement was contrary to state-imposed standards of eligibility for aid.

The court was asked to determine whether the defendants had discretionary immunity under the Tort Claims Act, Government Code section 820.2. The Supreme Court held: "The Welfare and Institutions Code clearly provides that eligibility standards for AFDC are to be determined at the state level, and that counties have the purely ministerial duty of carrying out those decisions. Section 11207 provides: 'Every county *shall* grant aid to any child eligible therefor, . . .' (Italics added.) Section 11250 sets forth eligibility standards, providing that aid '*shall* be granted . . . subject to the regulations of the department, to families with related children under the age of 18 years, except as provided in Section 11253, . . .' (Italics added.)" (*Ramos v. County of Madera, supra*, 4 Cal.3d at pp. 693-694.)

The Supreme Court concluded that eligibility is to be determined "solely by statute and departmental regulations issued at the *state level* . . . ." (*Ramos v. County of Madera, supra*, 4 Cal.3d at p. 694.) It cited sections 11250 and 11209. The latter provided then, as it does today, for the department to develop rules and regulations governing the administration of the aid program and that: "Such rules and regulations shall be binding upon the institutions, county welfare departments . . . ." The *Ramos* court held that the county and its agents may exercise only exceedingly limited powers of judgment in determining whether an applicant meets the eligibility standards established by the Legislature and the department. (*Ramos*, at p. 694.) For example, it concluded that the county had no discretion to require children to seek employment as a condition of receiving AFDC benefits, because the "basic policy decision" regarding their eligibility for aid had been made by the Legislature. (*Ibid.*)

The *Ramos* court concluded: "The authority given counties to implement the basic policy decisions of the Legislature, as here (and where delegated of the Department of Social Welfare), is purely ministerial. [Citation.] Such authority *does not extend to the alleged imposition of radically different standards of eligibility on persons otherwise entitled to aid.*" (*Ramos v. County of Madera, supra,* 4 Cal.3d at p. 695, italics added.)

The first step in our analysis is to determine whether the local program contradicts the statute and regulations. (*Sherwin-Williams Co. v. City of Los Angeles, supra,* 4 Cal.4th at p. 902.) The CalWORKs program provides that the standards of eligibility are to be set by state regulation; while the process of verifying eligibility of applicants is delegated to the counties. The regulatory scheme supports respondents' argument that the home visit program is a method of verifying eligibility rather than the improper imposition of a new condition of eligibility. The purpose of the home visit program is to provide additional information to the county in determining whether the state standards of eligibility are met. As a method of verifying eligibility under the state standards, the home works program does not conflict with, or duplicate, the statutory and regulatory scheme governing CalWORKs. Thus the CalWORKs statutes and regulations do not preempt the home visit program. As we next discuss, this interpretation is consistent with the position taken by the DSS.

Petitioners argue the home visit program conflicts with two regulations relating to home visits. MPP section 20-007.33 provides that "[m]ass or indiscriminate home visits are prohibited." The other regulation, MPP section 40-161, provides that a home visit prior to approval of aid "is required when living arrangements or other factors affecting eligibility, or apparent eligibility in cases of immediate need or diversion, cannot be satisfactorily determined without such a visit." They argue these provisions must be understood to mean that home visits are appropriate only where eligibility cannot be determined without a visit.

Respondents respond that DSS concluded that the home call visitation program does not violate any statute or regulation governing CalWORKs. This is shown by a letter dated September 3, 1999, from DSS deputy director Wagstaff to Lynn E. Bayer, Director Los Angeles County DPSS. In the letter, Wagstaff concludes that the proposed pilot project does not conflict with any state statute or regulation. "It has been suggested that Section 40-161 provides limits on home visitation. On the contrary, that section merely states when such a visit is required by counties. It does not limit the ability of a county to choose to include as part of its eligibility process, including at redetermination, a home visit requirement. Furthermore, your

proposal to view the children and have specified blocks of time for the home visit as part of the eligibility process does not pose a potential problem with our departmental regulations provided the schedule of the applicant as well as the [eligibility worker] is accommodated. This includes consideration of the work and school schedules of the applicant and their family members." Wagstaff notes that in the past, when caseloads were not so high and budgets not so tight, home visits were the norm in the eligibility determination process. "There is nothing in the Department's regulations *that prohibits a county from imposing reasonable home visit requirements on all applicants for CalWORKs benefits as a condition of eligibility.* Failure to cooperate in that part of the eligibility process, as with any requirement, would be sufficient basis for denial of the application." (Italics added.)

This interpretation is entitled to deference. ▮ " '[B]ecause of the agency's expertise, its view of a statute or regulation it enforces is entitled to great weight unless clearly erroneous or unauthorized.' [Citations.]" (*Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606].) ▮ In *Giles v. Horn, supra,* 100 Cal.App.4th 206, the Court of Appeal concluded that DSS approval of a county welfare plan to implement CalWORKs "is persuasive evidence that it was not in violation" of the governing statute. (*Id.* at p. 233.) Because the DSS's approval was not clearly erroneous, it was entitled to great weight. (*Id.* at pp. 233-234 [upholding county's use of private contractors for ministerial CalWORKs functions].)

▮ The traditional rules of statutory construction apply to our examination of the regulations governing CalWORKs. "Statutes and administrative regulations are governed by the same rules of construction." (*Farm Sanctuary, Inc. v. Department of Food and Agriculture* (1998) 63 Cal.App.4th 495, 505 [74 Cal.Rptr.2d 75].) "We must harmonize statutes dealing with the same subject if possible [citation] and avoid interpreting a statute in a way which renders another statute nugatory. [Citation.] ' "[T]he 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' (*People v. King* (1993) 5 Cal.4th 59, 69 [19 Cal.Rptr.2d 233, 851 P.2d 27], quoting *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr.

115, 755 P.2d 299].)" (*Peltier v. McCloud River R.R. Co.* (1995) 34 Cal.App.4th 1809, 1816 [41 Cal.Rptr.2d 182].)

 Applying the appropriate standard of deferential review, we rely on the DSS's interpretation of its own regulations—that the home visit pilot project is a method of ensuring eligibility that does not conflict with statute or regulation. Nor is there anything improper or insidious in an eligibility worker making observations that bear on an applicant's entitlement to benefits under CalWORKs.

The next question is whether the state has "fully occupied" the area of investigation of eligibility for CalWORKs benefits. The state fully occupies an area by general law when the Legislature either has "expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so . . . ." (*Sherwin-Williams Co. v. City of Los Angeles, supra,* 4 Cal.4th at p. 898.) An implied intent to fully occupy the area may be found if any of the three indicia is present: " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (*Ibid.*)

 The regulatory scheme delegates the gathering of evidence to determine eligibility to the counties. MMP section 40-157.21 provides: "The gathering of evidence necessary to make an eligibility determination of an applicant is a joint responsibility of the applicant and the county." This establishes the absence of express legislative intent to preempt this area. (See *Sherwin-Williams Co. v. City of Los Angeles, supra,* 4 Cal.4th at pp. 902-903.) This express authorization to allow the counties to gather necessary information to determine eligibility also disposes of any argument that a legislative intent to occupy the area may be implied. (*Id.* at p. 904 [statutory provisions authorizing local governments to act to prevent graffiti indicate no implied legislative intent to occupy the area].)

### III

 Petitioners characterize the home call visitation pilot program as an early fraud prevention and detection program, which violates statutes requiring a "reason to believe" a fraud investigation is necessary. (§ 11055.5, subd.

(d)(6), (7).) Section 11055.5, subdivision (d) sets out the circumstances in which a fraud investigation is appropriate.[2]

Respondents reply: "[I]t is not clear that the Home Call Program, which has a significant rehabilitative/client assistance function, qualifies as an early fraud detection program. Moreover, even if it is, it does not violate the statute, because the home visits are not welfare fraud investigations." They emphasize the training and direction the eligibility workers conducting the home visits received to recognize and assess the need for further supportive services, including domestic violence and substance abuse. Respondents note that the pilot program resulted in 218 expedited referrals for supplemental services.

The fact that eligibility workers are to be alert to obvious circumstances indicating that statements made in an application for benefits are untruthful, does not make the home visit a fraud investigation. There is nothing in the statute or the MPP that provides that fraud prevention is the exclusive duty of the SIU's. In fact, the MPP provides that eligibility workers may refer a case to the SIU unit if fraud is suspected. As we have discussed, the DSS concluded that there was no conflict between the home visit program and state statute or regulations of that department, and we give that determination great weight.

IV

Petitioners argue that the home call visitation program violates their state and federal constitutional rights.

Although we question whether the home visit constitutes a search within the meaning of the Fourth Amendment, we are satisfied that, if it does, it is

---

[2]Section 11055.5, subdivision (d) provides in pertinent part: "Each county which operates an early fraud prevention and detection program shall be subject to all of the following conditions: [¶] . . . [¶] (6) The county shall make a referral for welfare fraud investigation *when there is reason to believe* that a person, on behalf of himself or herself or others, has done any of the following: [¶] (A) Knowingly, and with intent to deceive or defraud, made a false statement or representation to obtain benefits, . . . [¶] (B) Knowingly, and with intent to defraud, failed to disclose a fact which, if disclosed, could result in a denial, . . . of benefits. [¶] . . . [¶] (D) Made any statement which he or she did not know to be true with reckless disregard of the truth, for the purpose of obtaining . . . benefits."

Section 11055.5, subdivision (d)(7) states that the county shall make a fraud referral when "there are reasonable grounds to believe that fraud, as specified in paragraph (6) exists." It defines "reasonable grounds" as existing in seven situations, including an applicant's failure to report information pertinent to eligibility; an applicant will not cooperate in providing necessary verification of information where "a questionable situation exists;" the county staff finds conflicting information that could affect eligibility; the county is aware of a situation involving applicant in program violations such as embezzlement, conspiracy, trafficking; the county is aware of an allegation of fraud or crime involving a social services program.

justified under the "special needs" rationale, a rapidly expanding area of Fourth Amendment jurisprudence.

■ " 'The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." ' [Citations.] When law enforcement officers conduct a warrantless search, the People bear the burden of justifying the search under a recognized exception to the constitutional warrant requirement. [Citations.] [¶] The United States Supreme Court, however, recognizes exceptions to this rule when ' " '*special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.*' " [Citations.] When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context. See, *e.g., Griffin* v. *Wisconsin* [(1987) 483 U.S. 868] at 873 [97 L.Ed.2d 709, 717, 107 S.Ct. 3164] (search of probationer's home); *New York* v. *Burger,* 482 U.S. 691, 699-703 [96 L.Ed.2d 601, 612-615, 107 S.Ct. 2636] (1987) (search of premises of certain highly regulated businesses); *O'Connor* v. *Ortega* [(1987) 480 U.S. 709] at 721-725 [94 L.Ed.2d 714, 725-728, 107 S.Ct. 1492] (work-related searches of employees' desks and offices); *New Jersey* v. *T.L.O.* [(1985) 469 U.S. 325] at 337-342 [83 L.Ed.2d 720, 731-735, 105 S.Ct. 733] (search of student's property by school officials); *Bell* v. *Wolfish,* 441 U.S. 520, 558-560 [60 L.Ed.2d 447, 480-482, 99 S.Ct. 1861] (1979) (body cavity searches of prison inmates).' [Citations.]" (*In re Tyrell J.* (1994) 8 Cal.4th 68, 76-77 [32 Cal.Rptr.2d 33, 876 P.2d 519], italics added.)

In applying the special needs analysis, courts first " ' "focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen, . . ." ' " (*In re Randy G.* (2001) 26 Cal.4th 556, 566 [110 Cal.Rptr.2d 516, 28 P.3d 239].) ■ The governmental interest in reducing welfare fraud is great. Given the limited resources available for public welfare programs, the government has a substantial interest in assuring that the aid goes to those truly eligible for the benefit.

Nor does the home visit program impose a substantial intrusion into personal privacy. (See *In re Randy G., supra,* 26 Cal.4th at pp. 566-567.) Eligibility workers must give notice that a home visit is planned within 10 days of the intake. The visit must take into account the applicant's work or education schedule, and may only be conducted during a weekday between

8:00 a.m. and 5:00 p.m. Eligibility workers are prohibited from opening drawers or closets during their walk-through of the home. We conclude that whatever intrusion is involved is minimal, and is outweighed by the government's interest in preventing welfare fraud.

This conclusion is consistent with the reasoning of the court in *Wyman v. James, supra,* 400 U.S. 309. That case involved denial of aid to a participant in New York's Aid to Families with Dependent Children who refused to comply with required home visits by caseworkers as a condition for assistance. The city department took the position that the home visit " 'is for the purpose of determining if there are any changes in her situation that might affect her eligibility to continue to receive Public Assistance, or that might affect the amount of such assistance, and to see if there are any social services which the Department of Social Services can provide to the family.' " (*Id.* at p. 314 [91 S.Ct. at p. 384].) Visits were not permitted outside working hours, and forcible entry and snooping were prohibited.

The *Wyman* court concluded that the visitation program did not constitute a search within the meaning of the Fourth Amendment. "It is true that the governing statute and regulations appear to make mandatory the initial home visit and the subsequent periodic 'contacts' (which may include home visits) for the inception and continuance of aid. It is also true that the caseworker's posture in the home visit is perhaps, in a sense, both rehabilitative and investigative. But this latter aspect, we think, is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context. We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search." (*Wyman v. James, supra,* 400 U.S. at pp. 317-318 [91 S.Ct. at p. 386].)

Alternatively, the court concluded that even if the home visit constituted some of the indicia of a search under the Fourth Amendment, it was not proscribed because it was not unreasonable. (*Wyman v. James, supra,* 400 U.S. at p. 318 [91 S.Ct. at p. 386].) The court relied on the paramount public interest in the needs of the child in a family requiring benefits, the characterization of the program as upholding a "public trust" in seeing that the intended beneficiaries of AFDC are the recipients, the obligation of the agency to see how the funds were utilized, the rehabilitative purpose of the program, and the extensive use of such visits in other jurisdictions. (*Id.* at pp. 318-319 [91 S.Ct. at pp. 386-387].) The *Wyman* court concluded that the intrusiveness of the visit was minimized by advance notice of a specific date

for the visit, and by rules prohibiting forcible entry or entry under false pretenses, or visitation outside working hours, or snooping in the home. (*Id.* at p. 321 [91 S.Ct. at pp. 387-399].)

The court rejected plaintiff's argument that the information gleaned by a home visit could be obtained by less intrusive means, concluding such other means would not always assure verification of actual residence or of actual physical presence in the home, which are requisites for AFDC benefits, or of impending medical needs. (*Wyman v. James, supra,* 400 U.S. at p. 322 [91 S.Ct. at p. 388].) The court also observed that the home visits were not part of a criminal investigation. (*Id.* at p. 323 [91 S.Ct. at pp. 388-389].)

The *Wyman* court cited the California case, *Parrish v. Civil Service Commission, supra* 66 Cal.2d 260, which involved early morning mass raid upon homes of welfare recipients, in observing: "Our holding today does not mean, of course, that a termination of benefits upon refusal of a home visit is to be upheld against constitutional challenge under all conceivable circumstances." (*Wyman v. James, supra,* 400 U.S. at p. 326 [91 S.Ct. at p. 390].)

While the jurisprudence of the special needs doctrine has expanded a great deal since *Parrish* was decided in 1967, our Supreme Court has neither overruled nor directly criticized *Parrish.* We proceed on the assumption that it remains good law.

But it is distinguishable. In *Parrish,* the social workers were instructed to "conduct a thorough search of the entire dwelling, giving particular attention to beds, closets, bathrooms and other possible places of concealment." (*Parrish v. Civil Service Commission, supra,* 66 Cal.2d at p. 264.) In contrast, the pilot project here did not involve mass raids in the early morning hours on the homes of welfare recipients to determine eligibility. Eligibility workers making a home visit are instructed not to open closets or drawers. Under this program, the applicants are notified that a home visit will be conducted. The visits are conducted under an established program that has both rehabilitative and fraud prevention purposes. (See also *Estes v. Rowland* (1993) 14 Cal.App.4th 508, 522 [17 Cal.Rptr.2d 901] [search conducted pursuant to regulatory scheme in furtherance of an administrative purpose may be conducted without probable cause if reasonable].)

In sum, the program rules do not present a facial violation of the Fourth Amendment. This resolves petitioners' claim that their right to privacy under article I, section 13 of the California Constitution was violated. "The United States and California Constitutions proscribe only *unreasonable* searches and seizures. 'In determining the standard of reasonableness applicable to a particular type of "search" or "seizure," a court must

balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." [Citations.]' (*Berry* v. *District of Columbia* (D.C. Cir. 1987) 833 F.2d 1031, 1034-1035 [266 App.D.C. 127]; *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 29 [26 Cal.Rptr.2d 834, 865 P.2d 633].) We also observe that, '[i]n the search and seizure context, the article I, section 1 "privacy" clause [of the California Constitution] has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or article I, section 13 of the California Constitution.' (*People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389].)" (*In re York, supra,* 9 Cal.4th 1133, 1149.)

### DISPOSITION

The judgment is affirmed.

Hastings, J., and Curry, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 23, 2003. Kennard, J., was of the opinion that the petition should be granted.