**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROCIO SANCHEZ; OLGA CASTRO;
MYRNA MARTINEZ; KAREN
BJORLAND; CHERYL MACLYMAN;
RHONDA KERN,
                *Plaintiffs-Appellants,*

v.

COUNTY OF SAN DIEGO; SAN DIEGO
COUNTY BOARD OF SUPERVISORS;
SAN DIEGO COUNTY DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
STEVEN ESCOBOZA, Director of the
San Diego County Health and
Human Services Agency, in his
official capacity; SAN DIEGO
OFFICE OF DISTRICT ATTORNEY;
PAUL PFINGST, District Attorney of
the County of San Diego, in his
official capacity,
                *Defendants-Appellees,*

and

AURORA, on behalf of themselves
and all others similarly situated,
                *Defendant.*

No. 04-55122

D.C. No.
CV 00-01467 JTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
October 18, 2005—Pasadena, California

Filed September 19, 2006

11497

Before: Andrew J. Kleinfeld, A. Wallace Tashima, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Fisher

**COUNSEL**

Eric Alan Isaacson, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, California, for the plaintiffs-appellants.

Thomas D. Bunton, Senior Deputy County Counsel, San Diego, California, for the defendants-appellees.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiffs-Appellants in this class action ("Appellants"), San Diego County welfare recipients, appeal from the district court's grant of summary judgment in favor of defendants, County of San Diego and various county officials (collectively, "San Diego County" or the "County"). Appellants contend that the district court erred in concluding that the County's welfare eligibility program ("Project 100%"), which requires all welfare applicants to consent to a warrantless home visit as a condition of eligibility, does not violate their rights under the United States Constitution, the California Constitution, or California welfare regulations prohibiting mass and indiscriminate home visits. Our jurisdiction is pursuant to 28 U.S.C. § 1291. We hold that San Diego County's Project 100% does not violate the United States Constitution, the California Constitution, or California welfare regulations. We therefore affirm the district court.

**BACKGROUND**

In 1997, the San Diego County District Attorney ("D.A.") initiated a program whereby all San Diego County residents who submit welfare applications under California's welfare program ("CalWORKS"), and are not suspected of fraud or ineligibility, are automatically enrolled in Project 100%. The parties are essentially in agreement as to the structure and operation of Project 100%. Under Project 100%, all applicants receive a home visit from an investigator employed by the D.A.'s office. The visit includes a "walk through" to gather eligibility information that is then turned over to eligibility technicians who compare that information with information supplied by the applicant. Specifically, the investigator views items confirming that: (1) the applicant has the amount of assets claimed; (2) the applicant has an eligible dependent

child; (3) the applicant lives in California; and (4) an "absent" parent does not live in the residence.

When applicants submit an application for welfare benefits, they are informed that they will be subject to a mandatory home visit in order to verify their eligibility. Applicants are also informed that the home visit must be completed prior to aid being granted, but are not given notice of the exact date and time the visit will occur. The visits are generally made within 10 days of receipt of the application and during regular business hours, unless a different time is required to accommodate an applicant's schedule. The home visits are conducted by investigators from the Public Assistance Fraud Division of the D.A.'s office, who are sworn peace officers with badges and photo identification. The investigators wear plain clothes and do not carry weapons.

The actual home visit consists of two parts: an interview with the applicant regarding information submitted during the intake process, and a "walk through" of the home. The visit takes anywhere from 15 minutes to an hour, with five to 10 minutes generally allocated to the "walk through." If the applicant refuses to allow a home visit, the investigator immediately terminates the visit and reports that the applicant failed to cooperate. This generally results in the denial of benefits.[1] The denial of welfare aid is the only consequence of refusing to allow the home visit; no criminal or other sanctions are imposed for refusing consent.

---

[1]Specifically, the D.A. investigator prepares and forwards a report regarding the home interview and visit to a welfare eligibility technician ("ET"). The ET then makes an eligibility determination based upon a review of the applicant's entire file. If the ET is unable adequately to verify the applicant's eligibility, benefits will be denied. The County has conceded that an applicant's failure to allow a home visit will generally result in the denial of benefits because the ET is unable adequately to verify the applicant's eligibility without the information included in the D.A. investigator's report.

The "walk through" portion of the home visit is also conducted with the applicant's consent. The applicant is asked to lead the "walk through" and the investigator is trained to look for items in plain view. The investigator will also ask the applicant to view the interior of closets and cabinets, but will only do so with the applicant's express permission.[2] While the investigators are required to report evidence of potential criminal wrongdoing for further investigation and prosecution, there is no evidence that any criminal prosecutions for welfare fraud have stemmed from inconsistencies uncovered during a Project 100% home visit.[3]

Appellants challenge the lawfulness of Project 100%.[4] The

---

[2]Appellants make much of the fact that investigators sometimes view the contents of laundry baskets or trash cans. The record, however, shows only one isolated instance of an investigator viewing the contents of a laundry basket, and it was done at the welfare applicant's suggestion.

[3]The County maintains that no applicant has been prosecuted for welfare fraud based upon anything observed or discovered during a home visit that contradicted information provided by the applicant. The County concedes, however, that if the home visit reveals information that an applicant may have received CalWORKS benefits in the past to which the applicant was not entitled, this information may lead to a subsequent criminal investigation. Moreover, the investigators do make referrals for criminal investigation, for example, if they discover evidence of contraband, child abuse, or a subject with outstanding felony warrants.

[4]Appellants alleged the following claims in their first amended complaint: (1) unreasonable searches and seizures (U.S. Const. amends. IV and XIV; 42 U.S.C. § 1983; Cal. Const. Art. 1 § 13); (2) deprivation of property without due process (U.S. Const. amend. XIV; 42 U.S.C. § 1983; Cal. Const. Art. 1 § 7); (3) violation of right to privacy (Cal. Const. Art. 1 § 1); (4) unconstitutional condition for receipt of benefits under the California Constitution; (5) unlawful imposition of new eligibility criteria for welfare benefits (7 C.F.R. §§ 273.1(f)(4)(i), (iii); 45 C.F.R. § 205.100; Cal. Welf. & Inst. Code §§ 10600, 11207, 11209, 11250; California Health & Human Services Manual of Policies & Procedures ("MPP") §§ 40-161, 63-300.543); (6) unlawful elicitation of unnecessary information (7 C.F.R. § 273.2; Cal. Welf. & Inst. Code § 10500; MPP §§ 40-101.12, 40-126.31); (7) failure to limit fraud investigation referrals (Cal. Welf. & Inst. Code §§ 11055.5(d)(6), 11055.5(d)(7)); (8) unlawful mass and indiscriminate home visits (MPP §§ 20-007.33; 40-161); and (9) violation of confidentiality (7 C.F.R. § 273.2(f)(5)(ii); Cal. Welf. & Inst. Code § 10850; MPP §§ 19-007, 40-101.13, and 40-157.22).

parties filed cross-motions for summary judgment on all claims. The district court first granted summary judgment to the County on most theories and claims for relief. It later granted summary judgment to Appellants on certain California state-law claims, enjoining the County from committing further violations of those provisions. The remaining claims, concerning violations of food-stamp regulations, were resolved by a stipulated settlement which was approved by the district court. After final judgment was entered, Appellants timely appealed the district court's decision on their claims arising under the Fourth Amendment of the United States Constitution, the California Constitution, and California welfare regulations prohibiting mass and indiscriminate home visits.

## STANDARD OF REVIEW

Whether summary judgment was properly granted presents a question of law, to be reviewed *de novo*. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). In conducting such review, "[w]e must . . . determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131-32 (9th Cir. 2003) (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)).

## DISCUSSION

### I

### Fourth Amendment Claim

[1] The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Appellants

argue that the warrantless home visits conducted under Project 100% violate the Fourth Amendment's protection against unreasonable searches as it applies to the State of California via the Fourteenth Amendment.

## A.  The Home Visits are Not Searches under the Fourth Amendment

We must first decide the threshold question of whether the home visits qualify as searches within the meaning of the Fourth Amendment. Appellants contend that the home visits are searches because they are highly intrusive and their purpose is to discover evidence of welfare fraud. The Supreme Court, however, has held that home visits for welfare verification purposes are not searches under the Fourth Amendment. *See Wyman v. James*, 400 U.S. 309, 317-18 (1971).

[2] In *Wyman*, the Court held that home visits by a social worker, made pursuant to the administration of New York's welfare program, were not searches because they were made for the purpose of verifying eligibility for benefits, and not as part of a criminal investigation. *Id.* While the Court's reasoning was brief, the opinion noted that the visits were "not forced or compelled, and that the beneficiary's denial of permission [was] not a criminal act." *Id.* The Court also reasoned that the visits were not searches because the beneficiary could choose to withhold consent and there would be "no entry of the home and . . . no search." *Id.* While the Court acknowledged that the nature of the visit was "both rehabilitative and investigative," importantly, the visits were not conducted as part of a *criminal* investigation. Accordingly, the Court concluded that the visits did not rise to the level of a "search in the traditional criminal law context." *Id.*[5]

---

[5]While no Ninth Circuit case has applied *Wyman* to analogous facts, the Seventh Circuit did so in *S.L. v. Whitburn*, 67 F.3d 1299 (7th Cir. 1995). The court reviewed a challenge to Milwaukee County's AFDC verification program, under which county caseworkers would conduct home visits

**[3]** *Wyman* directly controls the instant case.[6] Here, as in *Wyman*, all prospective welfare beneficiaries are subject to mandatory home visits for the purpose of verifying eligibility, and not as part of a criminal investigation. The investigators conduct an in-home interview and "walk through," looking for inconsistencies between the prospective beneficiary's application and her actual living conditions. As in *Wyman*, the home visits are conducted with the applicant's consent, and if consent is denied, the visit will not occur. Also as in *Wyman*, there is no penalty for refusing to consent to the home visit,

in order to verify the contents of the welfare beneficiary's application. *Id.* at 1301-02. The court applied *Wyman*, concluding that there was no search under the Fourth Amendment because caseworkers could only enter applicants' homes with their consent, refusal to consent was not a criminal act, and the underlying purpose of the visits was not criminal prosecution. *Id.* at 1307.

[6]The dissent contends that "*Wyman* is factually distinguishable" and thus not binding. Dissent at 11533. In support of this contention, the dissent relies primarily on its assertion that the *Wyman* home visits were "primarily rehabilitative," dissent at 11527, and that "the Project 100% home visits have only a minimal, if any, rehabilitative function." Dissent at 11529. There are two problems with this assertion. First, *Wyman* is based on two alternative holdings. As to its first holding — that the New York home visits were not searches — the only rehabilitative purpose on which the Court relied was its discussion of the federal welfare laws and their purpose of providing "financial assistance and rehabilitation and other services . . . to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life. . . ." *Wyman*, 400 U.S. at 315 (ellipses in the original) (citation and internal quotation marks omitted). The federal welfare laws are the same background against which San Diego County's welfare program is administered. So, on *Wyman*'s first holding, there is no greater showing of a rehabilitative purpose than there is in this case. Second, and thusly, the dissent's attempt to distinguish this case from *Wyman* go only to *Wyman*'s alternative holding — that even if the home visits are considered to be Fourth Amendment searches, they are reasonable. Thus, the dissent's assertion that *Wyman* is not binding is unpersuasive because it does not address *Wyman*'s primary holding that a welfare verification home visit is not a Fourth Amendment search at all.

other than denial of benefits.[7] *Id.* at 325. The fact that the D.A. investigators who make the Project 100% home visits are sworn peace officers does not cause the home visits to rise to the level of a "search in the traditional criminal law context" because the visits' underlying purpose remains the determination of welfare eligibility. *See id.* at 317; *see also New York v. Burger*, 482 U.S. 691, 717 (1987) ("[W]e fail to see any constitutional significance in the fact that police officers,

---

[7]The dissent suggests that Project 100%'s lack of a rehabilitative purpose sufficiently distinguishes this case from *Wyman* for purposes of determining whether the home visits constitute searches in the traditional criminal law context. *See* Dissent at 11529-31. First, as we point out in the immediately preceding footnote, the search in *Wyman* had no more of a rehabilitative purpose than the search here. Second, and in any event, whether the home visits serve a rehabilitative purpose is not the determinative inquiry under *Wyman*. As the dissent acknowledges, this factor is relevant only insofar as it indicates that the home visits are not intended as searches conducted in furtherance of a criminal investigation. *See* Dissent at 11532. ("*Wyman* concluded that New York's home visit was not 'in aid of any criminal proceeding' in part because it viewed the possibility of the caseworker visit leading to the discovery of fraud and a subsequent criminal prosecution as purely speculative." (citing *Wyman*, 400 U.S. at 323)).

Moreover, as the dissent acknowledges, *Wyman expressly* states that "if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow, then . . . that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct." *Id.* The dissent attempts to distinguish this case from *Wyman* by suggesting that "the County's program requires fraud investigators . . . to detect and report evidence of welfare fraud and other crimes." Dissent at 11532. This suggestion, however, simply does not square with the record. Project 100% does not *affirmatively* require that D.A. investigators look for evidence of welfare fraud or other crimes; rather, it is simply the duty of the investigators, as sworn peace officers, to report perceived evidence of unlawful activity. As Luis Aragon, the Chief of the D.A.'s Public Assistance Fraud Division, testified, the investigators are not tasked with "develop[ing] . . . evidence . . . that can be used in any other type of prosecution, but they're also not deaf and dumb. If they observe or are made aware of a situation that causes them to be concerned that unlawful activity has occurred, I expect they will report it to whatever the appropriate source is."

rather than 'administrative' agents, are permitted to conduct the [ ] inspection.").**[8]**

**[4]** Therefore, because we are bound by *Wyman*, we conclude that the Project 100% home visits do not qualify as searches within the meaning of the Fourth Amendment.

## B.   Even if the Home Visits are Searches, they are Reasonable

**[5]** "[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia Sch. Dist.*, 515 U.S. at 652-53 (internal quotation marks omitted).   The dis-

---

**[8]**We note that *Wyman*'s reasoning on the question of whether the home visits are searches under the Fourth Amendment arguably has been called into question by the Supreme Court's subsequent Fourth Amendment jurisprudence. The Court has since repeatedly held that consensual administrative searches qualify as searches under the Fourth Amendment, even though refusal to consent carried no criminal penalty and the searches were not part of a criminal investigation. *See, e.g.*, *Bd. of Educ. v. Earls*, 536 U.S. 822, 833 (2002) (holding that consensual random drug testing of students participating in extra-curricular activities were searches under the Fourth Amendment even though they were not part of a criminal investigation and a positive test resulted only in suspension from participation); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) (same); *see also United States v. Gonzalez*, 300 F.3d 1048 (9th Cir. 2002) (holding that consensual suspicionless searches of government employees' personal belongings in the workplace were searches even though refusal to consent carried no criminal penalty and the searches were not for law enforcement purposes). *Wyman*, however, still controls this case because of its "direct application," despite the reasoning of these later administrative search cases. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989))); *see also United States v. Hatter*, 532 U.S. 557, 567 (2001).

trict court found that the Project 100% home visits, even if considered searches, were reasonable under *Wyman*. Although we need not reach the question to decide Appellants' Fourth Amendment challenge, because the home visits do not constitute searches under *Wyman*, we agree with the district court that even if the home visits are searches under the Fourth Amendment, they are reasonable.[9]

### 1.  *Wyman v. James*

In *Wyman*, the Court concluded that the home visits, even if considered a search, were valid under the Fourth Amendment "because [they] did not descend to the level of unreasonableness . . . which is the Fourth Amendment's standard." *Wyman*, 400 U.S. at 318. The Court weighed several factors in balancing the governmental interest in conducting home visits against the intrusion into the welfare applicant's privacy. *Id.* at 318-24. Relevant to this analysis were: (1) the public's strong interest in the protection of dependent children and ensuring that aid provided from tax revenue reaches its intended and proper recipients; (2) the statute's focus on assistance and rehabilitation; (3) that the home visit was not a criminal investigation and did not involve police or uniformed authority; (4) the visits' procedural safeguards, including providing advanced written notice and prohibiting forced entry or "snooping" within the home; and (5) the serious administrative difficulties posed by a warrant requirement in the welfare context. *Id.*[10]

---

[9]Although we need not resolve the issue for Fourth Amendment purposes, nonetheless, addressing the "reasonableness" and "special needs" issues is helpful in analyzing Appellants' challenge under Article I § 13 of the California Constitution. While California's constitutional analysis parallels the inquiry under the Fourth Amendment, *see* Part II.A, *infra*, the California Supreme Court, in its parallel analysis of the California Constitution, is not bound by the strictures of *Agostini*, 521 U.S. at 237, as noted in footnote 8, *supra*.

[10]The Court also distinguished *Wyman* from its earlier decisions in *Camara v. Municipal Court*, 387 U.S. 523 (1967), and *See v. City of Seat-*

Here, as in *Wyman*, the home visits serve the important governmental interests of verifying an applicant's eligibility for welfare benefits and preventing fraud. As the Court acknowledged in *Wyman*, the public has a strong interest in ensuring that aid provided from tax dollars reaches its proper and intended recipients. *Id.* at 318. While the visits in this case differ from those in *Wyman* in that they are conducted by peace officers, this distinction does not transform a Project 100% visit into a "search in the traditional criminal law context." *Id.* at 317.[11] The investigators are not uniformed officers and will only enter the applicant's home with consent. Although the investigators will report any evidence of criminal activity for potential prosecution, this is not the underlying purpose of the visit, and no criminal prosecutions for welfare

_____

*tle*, 387 U.S. 541 (1967), where the petitioners had been criminally cited for refusing to consent to the warrantless inspections of their home and commercial warehouse, conducted to ensure health and safety code compliance. While the Court struck down the warrantless inspections in those cases, it noted that they involved a true search for violations and refusal to consent to inspection carried criminal penalties, whereas in *Wyman*, refusal to consent resulted only in a denial of welfare benefits. *Wyman*, 400 U.S. at 324-25.

[11]This conclusion is further supported by subsequent Supreme Court decisions. For example, in *Burger*, the Court upheld the warrantless inspection of a vehicle-dismantling business by uniformed police officers, reasoning:

> [W]e fail to see any constitutional significance in the fact that police officers, rather than "administrative" agents, are permitted to conduct the [ ] inspection. The significance respondent alleges lies in the role of police officers as enforcers of the penal laws and in the officers' power to arrest for offenses other than violations of the administrative scheme. It is, however, important to note that state police officers, like those in New York, have numerous duties in addition to those associated with traditional police work. . . . So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.

482 U.S. at 717.

fraud have stemmed from inconsistencies uncovered during a Project 100% home visit since the program's inception in 1997.[12]

The Project 100% home visits also have many of the same procedural safeguards that the *Wyman* Court found significant. *See Wyman*, 400 U.S. at 320-21. Applicants are given notice that they will be subject to a mandatory home visit and visits generally occur only during normal business hours. When the investigators arrive to conduct the visit, they must ask for consent to enter the home. If the applicant does not consent to the visit, or withdraws consent at anytime during the visit, the visit will not begin or will immediately be terminated, as the case may be.[13]

---

[12]The record shows that investigators would pass along evidence of criminal activity, such as drug use, child abuse, or even *past* welfare fraud, discovered during the course of a home visit. There is no evidence, however, that applicants have ever been prosecuted for welfare fraud as a result of inconsistencies discovered during the home visit, supporting a conclusion that the visits are intended, and in fact used, only as an eligibility verification tool. But the dissent "fail[s] to see why it follows from the lack of prosecutions for current or attempted welfare fraud that the home visits do not rise to the level of a traditional Fourth Amendment search." Dissent at 11532 n.6. We need look no further than *Wyman*, however, to learn why the discovery of evidence of other crimes does not cause a home visit to rise to the level of a Fourth Amendment search:

> If the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect. And if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow . . . that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct.

*Wyman*, 400 U.S. at 323; *see also Berger*, 482 U.S. at 717 ("So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.").

[13]In *Wyman*, the Court explained that any "burden" upon a homeowner's right against unreasonable intrusion is minimized because "[f]orcible entry or entry under false pretenses or visitation outside working hours or

Finally, the Court's concern that a warrant requirement would pose serious administrative difficulties in the welfare context is also present in this case. *Id.* at 323-24 ("The warrant procedure, which the plaintiff appears to claim to be so precious to her, even if civil in nature, is not without its seriously objectionable features in the welfare context."). As the Court in *Wyman* explained, "if a warrant could be obtained, it presumably could be applied for *ex parte*, its execution would require no notice, it would justify entry by force, and its hours for execution would not be so limited as those prescribed for home visitation." *Id.* This type of warrant requirement would make home visits more intrusive than the County's current suspicionless home visit program because welfare applicants' rights and privacy would be subject to greater infringement.

**[6]** Therefore, because the Project 100% visits serve an important governmental interest, are not criminal investigations, occur with advance notice and the applicant's consent, and alleviate the serious administrative difficulties associated with welfare eligibility verification, we hold that the home visits are reasonable under the Supreme Court's decision in *Wyman*.

---

snooping in the home are forbidden." *Wyman*, 400 U.S. at 387-88. While Appellants and the dissent, Dissent at 11533, argue that Project 100% allows "snooping" because investigators ask homeowners to open closets and drawers, we disagree. The Project 100% investigators only ask to view the contents of closets or drawers for verification-related purposes, and will do so only with the homeowner's explicit consent. For example, investigators may verify that children live in the home by asking to see children's clothing. Similarly, if the applicant is a single mother, investigators may verify that no males live in the home by asking to see the contents of the medicine cabinet. Since the investigators have *legitimate* verification-related reasons for viewing such items not in plain view, and only do so with the homeowner's explicit consent, their activity cannot fairly be characterized as "snooping."

## 2.   "Special Needs" Cases

**[7]** While *Wyman* provides adequate, independent grounds for holding that the Project 100% home visits are reasonable, the Supreme Court's Fourth Amendment jurisprudence has evolved significantly since *Wyman*, providing further support for this conclusion. Subsequent to *Wyman*, the Court articulated its "special needs" exception to the warrant requirement, holding that "[a] search unsupported by probable cause can be constitutional . . . when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted). The Court's "special needs" analysis involves two steps: (1) determining whether the government has articulated a valid "special need;" and, (2) analyzing whether the proposed administrative search is justified in light of that articulated "special need." *United States v. Scott*, 450 F.3d 863, 869-72 (9th Cir. 2006).

>   *a.   The County's administration of its welfare system is a "special need"*

In *Griffin*, the Supreme Court examined whether the State's operation of its probation system was a "special need" that justified the warrantless search of a probationer's home, based on reasonable grounds to suspect the presence of contraband. *Griffin*, 483 U.S. at 872. The Court held that the operation of a probation system was a valid "special need," explaining that the system worked towards genuine rehabilitation through intensive supervision and that a "warrant requirement would interfere to an appreciable degree." *Id.* at 873-76.

More recently, in *Earls*, the Court reaffirmed its "special needs" reasoning, holding that a public school's policy of requiring suspicionless drug testing for student athletes was justified in light of the school's "special need" to prevent and deter drug use among its students. *Earls*, 536 U.S. at 838. The

Court emphasized that the searches were not conducted for law enforcement purposes, and explained that the "special need" justified the intrusion on the student's privacy without individualized suspicion. *Id.* at 829.

In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), however, the Court held that a public hospital's policy of identifying and testing mothers whose children tested positive for drugs at birth was not justified under the "special needs" doctrine because "the immediate objective of the searches was to generate evidence *for law enforcement purposes*." *Id.* at 83 (emphasis in the original). The Court explained that the "central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment," and concluded that "the purpose actually served by the [ ] searches is ultimately indistinguishable from the general interest in crime control." *Id.* at 81 (internal quotation marks omitted).

*Ferguson* turned on the fact that the searches at issue were conducted for general law enforcement purposes. *See id.* The Court emphasized that while the drug testing program partially served a non-criminal purpose, the program's efficacy was ultimately tied to the successful prosecution of mothers whose children tested positive for drugs. *Id.* at 82-84. In *Wyman*, however, the Court specifically noted that home visits in the welfare context primarily serve the administrative function of eligibility verification, which is not a general law enforcement purpose. *Wyman*, 400 U.S. at 326. As discussed *supra*, the primary purpose of the Project 100% home visits is to verify eligibility for welfare benefits. While there may be a fine line between verifying eligibility and investigating fraud, the record here supports that the visits are indeed used primarily for verification and prevention purposes. Since the program's inception in 1997, not a single criminal prosecution for welfare fraud has resulted from inconsistencies uncovered during a Project 100% home visit. While investigators are required to report evidence of criminal violations for potential

prosecution, this does not make the home visits criminal investigations. *See Wyman*, 400 U.S. at 317. Moreover, unlike in *Ferguson*, 532 U.S. at 82-84, Project 100%'s efficacy is not dependent upon the prosecution of suspected welfare fraud cases.

**[8]** Therefore, because the underlying purpose of the home visits is to verify eligibility for welfare benefits, and not for general law enforcement purposes, we conclude that San Diego County has articulated a valid "special need."

### b.    Project 100% is reasonable in light of the County's "special need"

**[9]** Because we conclude that the administration of the County's welfare system presents a "special need" beyond those of normal law enforcement, we must now determine whether this need is "important enough to override the individual's acknowledged privacy interest [and] sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler v. Miller*, 520 U.S. 305, 318 (1997). "[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia*, 515 U.S. at 652-53 (internal quotation marks omitted). Specifically, we consider: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion; and (3) the importance of the government interest at stake. *See Earls*, 536 U.S. at 830-34; *Vernonia*, 515 U.S. at 654-61.

**[10]** Here, the nature of Appellants' privacy interest is significant because the government is conducting searches of their homes, a traditionally protected area of personal privacy.[14]

---

[14]The dissent quotes *Kyllo v. United States*, 533 U.S. 27, 40 (2001) ("[T]he Fourth Amendment draws a firm line at the entrance to the house."), to support its assertion that the County's home visits are unrea-

As illustrated by *Griffin*, however, a person's relationship with the state can reduce that person's expectation of privacy even within the sanctity of the home. When eligibility depends, in part, upon a person's physical residence in the state and actual presence at the place designated as their residence, verification of eligibility may be reasonably required in the form of the home visit under review here in order to ensure that funds are properly spent. Moreover, the home visits are conducted with the applicant's express consent, thus, further reducing the applicant's expectation of privacy.[15] Therefore, it is reasonable for welfare applicants who desire direct cash governmental aid to undergo eligibility verification through home visits.

---

sonable. Dissent at 11544. *Kyllo*, however, is completely inapposite and has no application to this case. The dissent's extensive reliance on *Kyllo* here and elsewhere, *see* Dissent at 11534, 11538, 11541, is misplaced because *Kyllo* involved a classic criminal law enforcement investigation conducted without the homeowner's consent. Likewise, the dissent's extensive reliance on *Scott*, *see* Dissent at 11534-35, 11538, 11540, 11542, 11543 n.13, is also misplaced. *Scott* expressly held that the scheme under examination there did not qualify under the special needs doctrine. *See* 450 F.3d at 872. Here, in contrast, the dissent "agree[s] with the majority that the County has articulated a valid 'special need' beyond ordinary law enforcement concerns." Dissent at 11538.

[15]Without citing any authority, the dissent asserts that a welfare applicant's consent to a home visit does nothing to reduce her expectation of privacy because "the coercive nature of the home visit renders the notion of consent effectively meaningless." Dissent at 11543. *Wyman*, however, addresses this very concern and reaches the opposite conclusion that even though the consequence of refusing a home visit is the denial of benefits, "[t]he choice is entirely [the applicant's], and *nothing of constitutional magnitude is involved.*" *Wyman*, 400 U.S. at 325 (emphasis added).

In addition, this Court has recently observed that "government may sometimes condition benefits on waiver of Fourth Amendment rights — for instance, when dealing with contractors, or *paying welfare benefits.*" *Scott*, 450 F.3d at 867-68 (citing *Wyman*, 400 U.S. at 317-18) (emphasis added).

**[11]** Next, we must weigh the character of the intrusion on Appellants' privacy. Appellants argue that the home visits are virtually unlimited in scope. As discussed above, however, the record demonstrates that the procedures used in conducting the home visits are designed to reduce the intrusion on the applicant's privacy. Investigators only examine areas of the home that they believe will provide relevant information pertaining to the applicant's welfare eligibility. If at any point before or during the visit, the applicant refuses to consent, or withdraws consent, the visit ends immediately. Additionally, inspections are completed in a reasonable amount of time and there is no evidence that any of the applicants has been subjected to abusive behavior during the home visits.

Finally, we must analyze the need for the intrusion in light of its efficacy in achieving the governmental interests at stake. Appellants argue that there is no statistically significant evidence that Project 100% has actually reduced welfare fraud. The County, however, produced data showing that, during the five-year period during which Project 100% was implemented, the overall denial rate increased from 40.6% to 47.7%, and there was an additional 4-5% increase in application withdrawals. While it is difficult to measure the precise efficacy of Project 100%, these empirical observations support the logical connection between the home visits and their intended purpose. Moreover, the visits are an effective method of verifying eligibility for benefits, and, at a minimum, the visits provide an important deterrent effect.

Appellants also contend that all necessary information for purposes of verification can be obtained from other sources and that the home visits merely duplicate the intake interviews. The Supreme Court has stressed, however, that the Fourth Amendment does not require that the government use the least intrusive means "because the logic of such elaborate less-restrictive alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *Earls*, 536 U.S. at 837. More importantly, the Court

has already rejected a similar argument in *Wyman*, explaining that "[a]lthough . . . secondary sources might be helpful, they would not always assure verification of actual residence or of actual physical presence in the home, which are requisites for AFDC benefits . . . ." *Wyman*, 400 U.S. at 322.

**[12]** Accordingly, because the Project 100% home visits are conducted in a reasonable manner, and serve an important administrative purpose, the Supreme Court's "special needs" line of cases provides further support for our conclusion that the home visits are reasonable under the Fourth Amendment.[16]

## II

## California Claims

### A. Article I § 13 of the California Constitution

Appellants argue that the Project 100% home visits violate their right to be free from unreasonable searches under Article I § 13 of the California Constitution. Appellants rely on *People v. Brisendine*, 531 P.2d 1099 (Cal. 1975), *superseded on other grounds by In re Lance W.*, 694 P.2d 744 (Cal. 1985), for the proposition that California courts interpret Article I § 13 as demanding broader protection than the Fourth Amendment.[17]

---

[16]In *Samson v. California*, 126 S. Ct. 2193, 2201 n.4 (2006), the Court recently noted that it has "sanctioned suspicionless searches in limited circumstances, namely programmatic and special needs searches. . . ."

[17]In *Brisendine*, the California Supreme Court departed from the Supreme Court's Fourth Amendment standards, imposing broader limitations on searches incident to a lawful arrest. *Brisendine*, 531 P.2d at 1111-15. In doing so, the court explained that "[i]n the search and seizure area our decisions have often comported with federal law, yet there has never been any question that this similarity was a matter of choice and not compulsion." *Id.* at 1112.

**[13]** The California Supreme Court has made clear, however, that "[t]he touchstone for all issues under the Fourth Amendment and article I**,** section 13 of the California Constitution is reasonableness." *Ingersoll v. Palmer*, 743 P.2d 1299, 1304 (Cal. 1987). This language indicates that the right to be free from unreasonable searches under Art. I § 13 of the California Constitution parallels the Fourth Amendment inquiry into the reasonableness of a search. *See e.g.*, *Smith v. Los Angeles County Bd. of Supervisors*, 128 Cal. Rptr. 2d 700 (Ct. App. 2002) (applying the Supreme Court's "special needs" rationale and *Wyman* to deny a similar challenge to a Los Angeles County welfare eligibility verification program arising under the state *and* federal constitutions); *see also Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 650 (Cal. 1994) ("The 'privacy' protected [under state law] is no broader in the area of search and seizure than the 'privacy' protected by the Fourth Amendment or by article I, section 13 of the California Constitution."). Accordingly, for the reasons discussed in Part I.B, *supra*, even assuming that Project 100% home visits qualify as searches, they are reasonable under the California Constitution.

Appellants nonetheless maintain that the California Supreme Court's decision in *Parrish v. Civil Service Commission*, 425 P.2d 223 (Cal. 1967), demonstrates that the California Constitution provides broader protection than its federal counterpart in the context of this case. *Parrish*, however, does not purport to expand the protections granted by the California Constitution beyond those granted by the United States Constitution, and instead, explicitly relies on *federal* law. *See id.* at 227 (citing *Frank v. Maryland*, 359 U.S. 360 (1959)).[18]

---

[18]The *Parrish* court's discussion of the reasonableness of the search and the voluntariness of consent raises serious doubts that the court relied on the California Constitution in finding that the searches were unreasonable. This is illustrated by the court's express statements addressing the issue in the case as one under the Fourth Amendment without reference to the California Constitution and the court's analysis of the reasonableness of the search under United States Supreme Court precedent. *See id.*

Moreover, *Parrish* is easily distinguished from the instant case.

In *Parrish*, the Alameda County welfare department conducted a series of suspicionless, unannounced early-morning raids of the homes of the county's welfare recipients in order to detect the presence of unauthorized males. *Id.* at 225. The purpose of the raids on recipients not suspected of fraud was to "persuade the public that the incidence of welfare fraud falls below popular estimates." *Id.* at 232. The raids were conducted at 6:30 a.m. on a Sunday by a pair of social workers. *Id.* at 225. The welfare recipient's social worker would knock on the recipient's door and request entry. *Id.* at 225-26. Refusal to consent could serve as a basis for terminating welfare benefits. *Id.* at 228. If consent was given, the caseworker would immediately proceed to the back door to admit his or her partner, with the pair proceeding to search the entire residence for evidence of welfare fraud. *Id.* at 226.

The court rejected the County's argument that the searches were administrative searches that could properly be conducted without probable cause and a warrant. *Id.* at 226-28. The court reasoned that the searches were very inconvenient to the occupant, were conducted without suspicion of fraud, and were far removed from orderly daytime administrative searches. *Id.* at 227-28. The court also reasoned that the raids could not be justified by consent because "[t]he request for entry by persons whom the beneficiaries knew to possess virtually unlimited power over their very livelihood . . . nulli[-fied] the legal effectiveness of the apparent consent." *Id.* at 229-30.

Even assuming that *Parrish* was decided under the California Constitution, and that the California Constitution provides broader protection than the Fourth Amendment, it is nonetheless clearly distinguishable and, thus, inapplicable under the facts of this case. *Parrish* involved mass raids, conducted without advance warning, on a Sunday morning at 6:30 a.m.

*Id.* at 225-26. The purpose of the raids in *Parrish* was to demonstrate the efficiency of welfare fraud detection to the public. *Id.* at 225. On the other hand, the Project 100% home visits are orderly daytime administrative searches conducted to verify welfare eligibility and prevent fraud. The Project 100% investigators provide the welfare applicants advance notice that they will be subject to a home visit and only conduct visits during business hours.  As the *Parrish* court itself noted, there is a "great gulf which separates an 'orderly' afternoon visit from the searches conducted shortly after dawn in the present case." *Id.* at 228.

We conclude therefore that *Parrish* provides no support for the hypothesis that Article I § 13 of the California Constitution provides greater protection than the Fourth Amendment in the context of this case. We conclude that the Project 100% home visits are reasonable under Article I § 13 of the California Constitution.

## B.   Article I § 1 of the California Constitution

[14] Appellants also argue that the Project 100% home visits violate their right to privacy under Article I § 1 of the California Constitution. As the California Supreme Court has recognized, however, in *In re York*, 892 P.2d 804 (Cal. 1995), "in the search and seizure context, the article I, section 1, privacy clause of the California Constitution has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or article I, section 13 of the California Constitution." *Id.* at 813 (citations and internal quotation marks omitted); *see also Hill*, 865 P.2d at 650 n.9. Therefore, Appellants' contention that Project 100% violates Article I § 1 of the California Constitution also fails because, as we have held, Project 100% searches are reasonable under the Fourth Amendment and Article 1 § 13 of the California Constitution.

### C.  Unconstitutional Conditions Doctrine

The California unconstitutional conditions doctrine holds that where the "receipt of a public benefit is conditioned upon the waiver of a constitutional right, the government bears a heavy burden of demonstrating the practical necessity for the limitation." *Robbins v. Superior Court*, 695 P.2d 695, 704 (Cal. 1985) (internal quotation marks omitted). Under the unconstitutional conditions doctrine, the governmental entity seeking to impose such a condition must establish that:

> (1) the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) the value accruing to the public from imposition of those conditions manifestly outweighs any result-ing impairment of constitutional rights; and (3) there are no alternative means less subversive of constitu-tional right, narrowly drawn so as to correlate more closely with the purposes contemplated by confer-ring the benefit.

*Parrish*, 425 P.2d 230-31 (citations omitted).

**[15]** A plaintiff alleging a violation of the unconstitutional conditions doctrine, however, must first establish that a con-stitutional right is infringed upon. *Id.* Here, Appellants must establish that San Diego County is conditioning the receipt of welfare benefits on the waiver of a constitutional right. Because we have held that the Project 100% home visits are reasonable, the receipt of welfare benefits is not being condi-tioned upon the waiver of a constitutional right under either the California or federal constitutions because the Fourth Amendment and Article 1 § 13 only create a right to be free from *unreasonable* government intrusions into the home. *See Earls*, 536 U.S. at 828; *In re York*, 892 P.2d at 813.

## D.   State Regulation Prohibiting "Mass" & "Indiscriminate" Home Visits

Appellants contend that Project 100% violates MPP § 20-007.33, which prohibits "[m]ass or indiscriminate home visits." Appellants argue that the home visits in this case are both "mass" and "indiscriminate" because they are performed on all applicants for aid and do not discriminate between applicants based on any reasonable suspicion of fraud.

[16] A careful reading of MPP § 20-007 as a whole, however, reveals that the regulation applies only to Special Investigative Units "*investigating suspected welfare fraud and suspected violations of the law.*" MPP § 20-007.1 (emphasis added). Based on the plain language of the regulation, we conclude that the California Department of Social Services did not intend to apply § 20-007.33 to the home visits at hand because the Project 100% investigators are *not* conducting for-cause investigations.[19] Moreover, the same argument raised by Appellants in this case was rejected by the California Court of Appeal in *Smith*, 128 Cal. Rptr. 2d at 706, which held that California's prohibition against "mass or indiscriminate" home visits, "which is contained in the MPP's voluminous fraud investigation procedures, [did not] limit procedures that are provided elsewhere in the MPP, and specifically in MPP [40-161], for determinations of eligibility for CalWORKS benefits." Accordingly, we hold that MPP § 20-007.33's prohibition against "mass or indiscriminate" home visits does not apply to the case at bench.

---

[19]While MPP § 20-007.33 applies to for-cause home visits, the controlling statutory scheme also clearly provides for the creation of not-for-cause early fraud prevention programs such as Project 100%. *See* Cal. Welf. & Inst. Code § 11055.5. Accordingly, since the MPP has no parallel provision prohibiting "mass and indiscriminate" home visits in the context of *suspicionless* home visits, we must assume that DSS intended to exclude situations such as this.

## CONCLUSION

We conclude that the Project 100% home visits are not Fourth Amendment searches under *Wyman*. Even assuming that they are searches, they are reasonable under *Wyman* and the Supreme Court's subsequent "special needs" cases. Because Project 100% searches are reasonable, they do not violate the Fourth Amendment or the California Constitution. Finally, MPP § 20-007.33's prohibition against "mass and indiscriminate home visits" is inapplicable to Project 100% home visits because § 20-007.33 applies only to for-cause home visits.

Accordingly, the district court's grant of summary judgment in favor of San Diego County is **AFFIRMED.**

---

FISHER, Circuit Judge, dissenting:

I cannot agree with the majority's conclusion that *Wyman v. James*, 400 U.S. 309 (1971), "directly controls" our resolution of this case. *See* Maj. Op. at 11507. Unlike the case before us, *Wyman* involved a primarily *rehabilitative* home visit by a social assistance caseworker "whose primary objective [was], or should [have been], the welfare, not the prosecution, of the aid recipient for whom the worker [had] profound responsibility." 400 U.S. at 323-24. That is a far cry from the program carried out by the County of San Diego, whose Project 100% home visits entail a law enforcement agent — trained *not* to give advice to welfare applicants — walking through the applicant's home in search of physical evidence of ineligibility that could lead to criminal prosecution either for welfare fraud or other crimes unrelated to the welfare application. In light of the significant differences in scope and implementation between the home visits at issue in *Wyman* and those challenged here, I disagree with the majori-

ty's conclusion that the home visits do not rise to the level of a Fourth Amendment search.

Nor do I agree with the majority's improper discounting of the Appellants' heightened privacy interest in their home. In the majority's view, even if the home visit is a search, it is reasonable because the Appellants' relationship with the state as potential welfare recipients "reduce[s] the expectation of privacy even within the sanctity of the home." Maj. Op. at 11517. To support this conclusion, the majority relies on *Griffin v. Wisconsin*, 483 U.S. 868 (1987), a case that upheld the constitutionality of a warrantless search of a probationer's home. By suggesting that welfare applicants may be treated the same as convicted criminals, the majority ignores the limits implicit — and explicit — in *Griffin*.

The Project 100% home visits constitute searches because they violate "a subjective expectation of privacy [in the home] that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Even assuming the County's need to verify eligibility and prevent fraud, that legitimate need is not "important enough to override the [welfare applicant's] acknowledged privacy interest" in the home nor "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler v. Miller*, 520 U.S. 305, 318 (1997). The visits as implemented are unreasonable searches under the Fourth Amendment and Article I § 13 of the California Constitution. They also violate the Appellants' right to privacy and the unconstitutional conditions doctrine under California law. I respectfully dissent.

## I.

It is well established that the Fourth Amendment protects a citizen's "legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "As the text of the Fourth Amendment indicates, the ultimate measure of the

constitutionality of a governmental search is 'reasonableness,' . . . . [and] whether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia School District 47J v. Acton*, 515 U.S. 646, 652-53 (1995) (citations and internal quotations omitted). Thus, the first question is whether the County's home visits are searches.

In *Wyman*, the Supreme Court held that a primarily rehabilitative home visit by a New York social assistance caseworker did not constitute a search for purposes of the Fourth Amendment. 400 U.S. at 317-18. The Court further held that even if the visit were a search, it "[did] not fall within the Fourth Amendment's proscription" because it was reasonable. *Id.* at 318. Several aspects of New York's home visit program — absent in Project 100% — persuaded the Court to reach these conclusions, and the majority too readily dismisses the fundamental differences between the two programs when it holds that *Wyman* "directly controls" this case. Maj. Op. at 11507.

As an initial matter, the majority reads *Wyman*'s narrow holding too broadly. *Wyman* did not create a blanket rule that "home visits for welfare verification purposes are not searches under the Fourth Amendment." *See* Maj. Op. at 11506. Rather, *Wyman*'s holding was specific to the facts before it:

> We therefore conclude that the home visitation *as structured by the New York statutes and regulations* is a reasonable administrative tool; that *it* serves a valid and proper administrative purpose for the dispensation of the AFDC program; that *it* is not an unwarranted invasion of personal privacy; and that *it* violates no right guaranteed by the Fourth Amendment.

*Wyman*, 400 U.S. at 326 (emphasis added). Indeed, the Court explicitly left open the possibility that home visits, such as the

one before us today, might run afoul of Fourth Amendment principles: "Our holding today does not mean, of course, that a termination of benefits upon refusal of a home visit is to be upheld against constitutional challenge under all conceivable circumstances." *Id.* With this more proper understanding of *Wyman*'s holding in mind, I do not believe we are bound to hold that the Project 100% home visits are not searches.

First, as the majority recognizes, *Wyman* emphasized that although the caseworker visits were "both rehabilitative and investigative," *id.* at 317, the investigative aspect "did not rise to the level of a 'search in the traditional criminal law context.' " Maj. Op. at 11506 (quoting *Wyman*, 400 U.S. at 317). In effect, the Court concluded that the New York home visit was primarily *rehabilitative*. *See Wyman*, 400 U.S. at 323 (explaining that "the program concerns dependent children and the needy families of those children. *It does not deal with crime or with the actual or suspected perpetrators of crime.* The caseworker is *not a sleuth* but rather, we trust, is a *friend to one in need*.") (emphasis added). The Court also found significant that "snooping in the home [is] forbidden." *Id*. at 321.

In concluding that *Wyman* binds us, the majority notes that the caseworker visits there, like the Project 100% visits, were conducted with the applicant's consent, and that the only penalty for refusing consent is the denial of benefits. Maj. Op. at 11507-09. At the same time, the majority correctly recognizes that the Project 100% home visits are made not by social workers but by *district attorney fraud investigators.* Maj. Op. at 11507-08, 11511-12. However, the majority concludes that this difference "does not cause the home visits to rise to the level of a 'search in the traditional criminal law context' " because the visits' underlying purpose remains the determination of welfare eligibility." Maj. Op. at 11508 (quoting *Wyman*, 400 U.S. at 317); *see also id.* at 11511-12. In addition, the majority dismisses the Appellants' claims of snooping because the investigators "ask to view the contents of closets or drawers for verification-related purposes, and will

do so only with the homeowner's explicit consent." Maj. Op. at 11512-13 n.13.

I find the majority's analysis troubling in several respects. To begin, the majority admittedly draws a "fine line" between searches to determine eligibility and those aimed at investigating fraud. *See* Maj. Op. at 11515. In practice, the distinction is one without a difference. In verifying eligibility, fraud investigators — as their job title suggests — necessarily are investigating potential fraud through their enforcement of welfare laws and regulations. Indeed, unlike in *Wyman*, the investigators testified that as peace officers they have a duty to — and do — look for and report evidence of crimes.[1] [*See, e.g.*, ER 85, Ex.14:76, Ex. 1:169, Ex. 8:42-43] Thus, we do not, as the majority suggests, deal here with a visitation that "serves to discourage misrepresentation or fraud" as a mere "*byproduct* of that visit," as was the case in *Wyman*. *See* Maj. Op. at 11512 n.12 (quoting *Wyman*, 400 F.3d at 323) (emphasis added).

At the same time, the majority overlooks a key distinction between the New York home visits and those carried out by the County of San Diego, namely, that the Project 100% home visits have only a minimal, if any, rehabilitative function. The record reveals that the program is operated *exclusively* by the District Attorney's Public Assistance Fraud Division, which is the County's Special Investigative Unit (SIU), as an "early

---

[1]There is no dispute that the investigators make referrals for criminal investigation if they discover evidence of contraband, child abuse or a subject with outstanding felony warrants. On occasion, the investigators even arrange for arrests. [ER 85, Ex.7:107-08] The majority's attempt to view the fraud investigators' duty to report evidence of welfare fraud or other crimes as distinct from any "affirmative" requirement on the part of Project 100% is unavailing. *See* Maj. Op. at 11507-08 n.7. By utilizing sworn peace officers from the district attorney's office to conduct the home visits — rather than social workers from the County's welfare agency — Project 100% necessarily requires the investigators to look for and report evidence of fraud and other crimes.

fraud prevention *and detection* program;" the County's welfare agency does not exercise any supervisory responsibility over the program. [ER 85, Ex. 14:156 (Reid Depo)]. Thus, whereas in *Wyman* the home visits were conducted by social workers who had "profound responsibility" for the aid recipient, *Wyman*, 400 F.3d at 323, here the visits are conducted by agents of the district attorney charged only with verifying welfare eligibility and detecting fraud using investigative techniques.[2] [ER 85, Ex. 5,7,8,9,14] Unlike in *Wyman*, these fraud

---

[2]As peace officers under California Penal Code § 30.35, these fraud investigators have received training at law enforcement academies in interrogation techniques and arrest-and-control procedures. [ER 85, Ex. 5,2,7,8] According to Frank Reid, a supervising investigator for the San Diego County District Attorney, the investigators identify themselves to applicants by showing either a metal badge or folding identification card with the District Attorney logo, the District Attorney's name and the investigator's name, photograph and badge number. [ER 85, Ex. 14:36-37] The majority's reliance on *New York v. Burger*, 482 U.S. 691 (1987), to dismiss this differentiating aspect of the Project 100% home visits is misguided. *See* Maj. Op. at 11511 n.11. First, *Burger* did not address *home visits* by sworn peace officers, but rather whether warrantless searches by police officers of automobile junkyards (conducted pursuant to a statute authorizing them) fell within the exception to the warrant requirement for administrative inspections of "closely regulated" businesses. 482 U.S. at 693, 699-703. The Court held that these searches were exempted, in part because "an operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy in this 'closely regulated' business." *Id.* at 707. Moreover, although *Burger* upheld the regulatory scheme against a Fourth Amendment challenge, the Court explicitly stated that both the inspections and the overall scheme were, as the majority itself recognizes, "*properly administrative*." *See Burger*, 482 U.S. at 717 ("*So long as a regulatory scheme is properly administrative*, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.") (emphasis added); *see also id.* at 693 ("The case also presents the question whether an *otherwise proper administrative inspection* is unconstitutional . . . ." ); *id.* at 716 ("The discovery of evidence of crimes in the course of an *otherwise proper administrative inspection* does not render that search illegal or the administrative scheme suspect.") (emphases added). Unlike in *Wyman*, the record here demonstrates that neither the home visits as conducted nor the program as implemented are "properly administrative," so *Burger* is inapposite.

investigators do not interview the applicant inside the home to discuss "any changes in [the applicant's] situation that might affect her eligibility . . . [or] the amount of [her] assistance, and [whether] there are any social services which the Department of Social Services can provide to the family." *Wyman*, 400 U.S. at 314 (quoting a letter from the New York City Department of Social Services describing the home visit's "purpose"). Quite the contrary, the County's fraud investigators are trained *not* to give advice to applicants because their focus is "highly limited" to legal compliance.[3] [ER 85, Ex.1:170] According to the defendants themselves, the program's objective is not to assist the needy, but to "increase welfare fraud prevention efforts and to increase program integrity."[4] [ER 86, Ex. 48:14 (Answer 64)] Thus, that the fraud investigators are not *exclusively* engaged in a criminal investigation does not alter an important purpose of the home visits, which is to investigate and detect welfare fraud.[5]

---

[3]For example, according to the defendants, if the home visit reveals information that an applicant may have received CalWORKS benefits in the past for which the applicant was not entitled, the fraud investigator refers the case to the District Attorney's "full-field" division for criminal investigation and possible prosecution. [ER 85, Ex.7:105-06]

[4]Although the majority is correct that the federal welfare laws are the "same background against which San Diego's welfare program is administered," Maj. Op. at 11507 n.6, this does not demonstrate that the purpose of the *Project 100% home visits* is to provide "financial assistance and rehabilitation and other services . . . to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life," which was the case in *Wyman*. 400 U.S. at 315 (ellipses in original) (citation and internal quotation marks omitted). Indeed, the record in this case is to the contrary. I therefore cannot agree with the majority's bald assertion that there is "no greater showing of a rehabilitative purpose than there is in this case." Maj. Op. at 11507 n.6.

[5]The majority's suggestion that I have mischaracterized the underlying purpose of the Project 100% home visit itself misreads the record in this case and misconstrues *Wyman*. I do not suggest that the underlying purpose of Project 100% is to investigate crimes other than welfare fraud, nor do I dispute that the home visit in *Wyman* was not a criminal investigation, did not "equate with a criminal investigation," and was not "in aid of any

Indeed, *Wyman* concluded that New York's home visit was not "in aid of any criminal proceeding" in part because it viewed the possibility of the caseworker visit leading to the discovery of fraud and a subsequent criminal prosecution as purely speculative. 400 U.S. at 323 (explaining that "if the visit should, *by chance*, lead to the discovery of fraud and a criminal prosecution should follow, then . . . that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct"). Of course, Project 100% is not a program in which there is some remote "chance" that a caseworker trying to help a needy applicant will stumble upon evidence of criminal activity. Instead, the County's program requires fraud investigators with no expertise in social work and no object of rehabilitating the applicant to detect and report evidence of welfare fraud and other crimes. Inexplicably, the majority sees little difference between the two. Indeed, despite acknowledging that fraud investigators "do make referrals for criminal investigation," Maj. Op. at 11504 n.3, the majority curiously concludes that the visits are nonetheless "intended, and in fact used, *only* as an eligibility verification tool." Maj. Op. at 11512 n.12 (emphasis added). The County's assertion to the contrary — which the majority itself accepts — belies any such conclusion.[6]

---

criminal proceeding." *Wyman*, 400 U.S. at 323. However, given the scope of the fraud investigators' duties and responsibilities — that they are charged not only with verifying eligibility but also with detecting welfare fraud and reporting evidence of other crimes — the same cannot be said of the home visits conducted by the County of San Diego.

[6]The majority finds comfort in the lack of evidence that applicants have ever been prosecuted for welfare fraud as a result of inconsistencies discovered during the visit. Maj. Op. at 11512 n.12. In light of the County's concession that the visits can and do lead to prosecutions for *other crimes* — including past welfare fraud — I fail to see why it follows from the lack of prosecutions for current or attempted welfare fraud that the home visit does not rise to the level of a traditional Fourth Amendment search. It is clear that the home visits remain primarily *investigative*, notwith-

Finally, it is far from clear that Project 100% forbids "snooping," as was the case in *Wyman*. 400 U.S. at 321. When walking through the welfare applicant's home, a fraud investigator may request to look at the contents of bedrooms, closets, kitchens, bathrooms, medicine cabinets and drawers in search of evidence of ineligibility or fraud. The majority reasons that because consent is required, the investigator's activity "cannot fairly be characterized as 'snooping.' " Maj. Op. at 11513 n.13. But obtaining consent to snoop cannot change the nature of the ensuing conduct — *snooping* — any more than obtaining consent to search changes the nature of the *search* that follows. The question is whether looking in medicine cabinets, laundry baskets, closets and drawers for evidence of welfare fraud — even with consent — constitutes snooping. I doubt my colleagues in the majority would disagree that an IRS auditor's asking to look in such places within their own homes to verify the number of dependents living at home would constitute snooping.

Far from having "direct application," Maj. Op. at 11509 n.8, *Wyman* is factually distinguishable from the case at bar, and does not preclude our holding that the home visits carried out by the County of San Diego are unreasonable searches under the Fourth Amendment.[7]

---

standing that the County may not prosecute applicants for discrepancies in their applications. Moreover, that the home visits have not led to prosecutions for current welfare fraud might reflect that welfare applicants generally are not trying to cheat the government out of scarce public resources; or that many innocent and impoverished people are not committing welfare fraud and instead are having their privacy invaded; or that the fraud investigators are in fact interested mostly in discovering other types of crimes.

[7]The majority suggests that the Seventh Circuit's decision in *S.L. v. Whitburn*, 67 F.3d 1299 (7th Cir. 1995), supports its application of *Wyman* to the facts of this case. Maj. Op. at 11506-07 n.5. But the home visits in *Whitburn* are also distinguishable from those at issue here. First, the Milwaukee County Department of Social Services administered the home

## II.

The Supreme Court has long held that a "Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)).[8] "This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to *administrative inspections designed to enforce regulatory statutes*."

visit program through field representatives of a private investigative service whose only purpose was to verify eligibility. Law enforcement agents do not appear to have played any role in the visits. *Whitburn*, 67 F.3d at 1302. Second, the home visits were not required of all first-time applicants. Rather, a caseworker would refer an applicant's case to the investigative service only if he or she determined that the application needed further verification, and such verification "*could* include a home visit," though one was not necessarily required. *Id.* (emphasis added). Third, although the home visits also required consent, the field representatives were prohibited from telling applicants that their benefits would be cut off if they refused to consent to the visit, thus lessening any concerns of coercion. *Id.* at 1308. By contrast, the County explicitly informs applicants through the Project 100% application packet, in posted notices and through an orientation video that the home visit *must* be completed before aid will be granted. ER 81, Ex. 11; ER 85, Ex. 23:1. Finally, unlike the case before us, *Whitburn* noted that "[t]here is no evidence or reason to believe that an applicant who declines the home visit will be denied benefits *even if satisfactory verification of eligibility is provided by some other means*." *Id.* at 1308 (emphasis added). Under Project 100%, the home visit must occur regardless of whether the information is available elsewhere, and as the County concedes, an applicant's refusal to consent to a walkthrough nearly always will result in a denial of benefits. *See* Maj. Op. at 11503.

[8]I disagree with the majority's contention that *Kyllo* is inapposite because it involved a "classic criminal law enforcement investigation conducted without the homeowner's consent." Maj. Op. at 11517 n.14. Notwithstanding the majority's attempt to read *Kyllo* narrowly, the Court there reaffirmed a core Fourth Amendment principle, namely "the right of a man to retreat into his own home and there be free from unreasonable *governmental intrusion*." 533 F.3d at 31 (emphasis added).

*Burger*, 482 U.S. at 699 (emphasis added). Of course, this focus on subjective expectations might lead one to conclude that a welfare applicant destroys any such privacy expectation when she seeks aid from the government that is conditioned upon a home visit. *See also United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2006). But as we made clear in *Scott*:

> the Supreme Court has resisted this logic, recognizing the slippery-slope potential of the *Katz* doctrine:
>
> "If the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes . . . In such circumstances, where an individual's subjective expectations had been 'conditioned' by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a 'legitimate expectation of privacy' existed in such cases, a normative inquiry would be proper."

*Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 n.5 (1979)). Here, we must decide whether welfare applicants continue to have a legitimate expectation of privacy in their homes even after consenting to a home visit. The answer to that question necessarily requires that we examine whether the home visit was a reasonable search.

We explained in *Scott* that assent to a search "is merely a relevant factor in determining how strong [the individual's] expectation of privacy is." *Id.* at *9. Indeed, we have held that even convicted criminals — a group more readily subject to restrictions than welfare applicants — "do not waive their Fourth Amendment rights by agreeing, as a condition of pro-

bation, to 'submit [their] person and property to search at any time upon request by a law enforcement officer.' " *Id.* at *10 (quoting *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 261 (9th Cir. 1975) (en banc)). Thus, the applicant's consent to the home visit is valid only if, taking the fact of consent into account, the visit was a reasonable search. *Id.*

The majority concludes that the Project 100% home visits, even if considered searches, were reasonable under both the Supreme Court's decision in *Wyman* and its subsequent line of "special needs" cases. Respectfully, I disagree. Neither *Wyman* nor the special needs doctrine renders constitutional the entry and inspection of homes under Project 100% by agents of the district attorney without warrants, probable cause or individualized suspicion of ineligibility or fraud.

## A.

In holding that the Project 100% home visits are reasonable, the majority observes that, as in *Wyman*, they occur with advance notice, the applicant's consent and serve the "important governmental interests of verifying an applicant's eligibility for welfare benefits and preventing fraud." Maj. Op. at 11511.[9] But even assuming that the County adequately apprises the applicants of the scope of the walk-through, the similarities between the two programs end there.[10]

---

[9]The majority also asserts that the visits "alleviate the serious administrative difficulties associated with welfare eligibility verification," but does not explain how such alleviation occurs. Maj. Op. at 11513.

[10]Although the applicants are informed that the fraud investigators will visit their homes to "verify" and "check" information, it is hardly clear that they are given notice that the agents will perform a walk-through of the home and seek access to its most intimate parts in the course of their duties. For example, the CalWORKS application package contains a document titled "Notice to All CalWORKS Applicants - Home Call Verification," which states: "A Fraud Investigator with the District Attorney's Office will come to your home *to verify the facts related to your application* for public assistance. The Fraud Investigator may also make other

The visits in *Wyman* were designed primarily to promote recipients' "personal, rehabilitative orientation." 400 U.S. at 320. The Court emphasized that the visits did not focus on ferreting out ineligible recipients, but rather on "restoring the aid recipient 'to a condition of self-support,' and [on] the relief of his distress." *Id.* at 319. By contrast, Project 100% is exclusively concerned with fraud and legal compliance and thus employs agents of the district attorney to conduct walk-through inspections of all applicants' homes in search of evidence of ineligibility, fraud and other crimes.

The majority's holding extends *Wyman* to a radically different set of facts. If the Project 100% home visits are constitutional, it is only because they are justified under the special needs doctrine, and in my view, they are not.

### B.

The Supreme Court has relaxed the Fourth Amendment's warrant requirement "when 'special needs, *beyond the normal need for law enforcement*,' make [it] impracticable." *Griffin*, 483 U.S. at 873 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in the judgment)) (emphasis added). The special needs cases make clear that courts must focus on the "primary" or "ultimate" purposes of the search in question to determine whether the purported need is beyond the normal need for law enforcement. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 38, 41 (2000) (invalidating a roadside checkpoint program aimed at enforcing drug laws through drug-sniffing dogs and visual inspection of cars, because its "primary purpose was to detect

---

contacts. County policy requires that a home call be completed *to verify information given* by all new applicants *prior* to granting ongoing Cal-WORKS . . . . The final eligibility determination will be made by the Eligibility Technician assigned to your case after the Fraud Investigator has completed their investigation." (Emphasis added.) [ER 81, Ex.11]

evidence of ordinary criminal wrongdoing"); *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001) (invalidating a state hospital's practice of testing pregnant women for cocaine and providing the results to the police, because the "ultimate purpose" of the testing program — the "beneficent" goal of "protecting the health of both mother and child" — " 'is ultimately indistinguishable from the general interest in crime control.' " (quoting *Edmond*, 531 U.S. at 44)). Thus, where the Court has upheld suspicionless drug testing programs, it has concluded that "the 'special need' . . . was one divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79; *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) (upholding the drug testing of railroad personnel involved in train accidents to ensure public safety); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 670 (1989) (upholding the drug testing of federal customs officers who carry arms or are involved in drug interdiction to ensure that they "are physically fit, and have unimpeachable integrity and judgment"); *Vernonia*, 515 U.S. at 664-65 (upholding the drug testing of high school student athletes to prevent drug addiction among students and maintain order in schools)).

Assuming that the County's need to verify eligibility and prevent welfare fraud is the primary purpose of the Project 100% home visit, I agree with the majority that the County has articulated a valid "special need" beyond ordinary law enforcement concerns. *Cf. Scott*, 450 F.3d at 870 (explaining that the government's need to ensure that pre-trial releasees appear in court "implicates the efficient functioning and integrity of the judicial system," which is "a purpose separate from the general interest in crime control"). The question is whether the County's need is "important enough to override the [welfare applicant's] acknowledged privacy interest" in the home and "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318. To balance the home visit's intrusion on the applicant's Fourth Amendment interests against its promotion of legitimate governmental interests, we

must consider: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion; and (3) the importance of the government interest at stake and the efficacy of the policy in meeting it. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 830-34 (2002).

In this case, the nature of the privacy interest is at its "zenith," *Scott*, 450 F.3d at 871, because the search involves the home, and warrantless searches of the home are "presumptively unreasonable." *Payton*, 445 U.S. at 586; *see also Kyllo*, 533 U.S. at 31 ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."). Although the majority acknowledges that the Appellants' privacy interest is "significant," it explains that "a person's relationship with the state can reduce [the] expectation of privacy even within the sanctity of the home." Maj. Op. at 11517. To support this conclusion and thereby circumvent the presumption of unreasonableness, the majority again erroneously relies on *Griffin.*

*Griffin* held that a state's operation of its probation system was a special need that justified the warrantless search of a probationer's home. Importantly, *Griffin* noted that "[p]robation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." 483 U.S. at 874 (internal quotation marks and citation omitted). The Court then explained that as *convicted criminals*, probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Id.* (internal quotation marks and citation omitted). Griffin's status as a felon on probationary release played a crucial part in the Court's decision to permit the warrantless home search at issue there:

These restrictions are meant to assure that the probation serves as a

> period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed. . . . Supervision, then, is a "special need" of the State permitting a degree of impingement upon privacy *that would not be constitutional if applied to the public at large.*

*Id.* at 875 (internal citation omitted) (emphasis added). In *Ferguson*, the Supreme Court confirmed that "*Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large." 532 U.S. at 79-80 n.15.

Of course, unlike convicted felons, welfare applicants have no lesser expectation of privacy in their homes than the rest of us. *See also Scott*, 450 F.3d at 872 (distinguishing *Griffin* in a case involving warrantless drug testing of pre-trial releasees, because in contrast to probationers, "[p]eople released pending trial . . . have suffered no judicial abridgment of their constitutional rights"). In this case, the Appellants have committed no wrong and the defendants have all but disclaimed any rehabilitative or supervisory purpose in Project 100%. *See Vernonia*, 515 U.S. at 654 (confirming that it is the "supervisory relationship between probationer and State [that] justifies 'a degree of impingement upon [a probationer's] privacy that would not be constitutional if applied to the public at large' ") (quoting *Griffin*, 483 U.S. at 875). *Griffin*, standing alone, does not provide a basis to conclude that welfare applicants have a reduced expectation of privacy because of their relationship with the state.[11]

Nor do the Supreme Court's more recent cases lend themselves to such a conclusion. *Vernonia*, for example, held that

---

[11]*Griffin* appears to be the only case in which "special needs" permitted a warrantless entry and search of anyone's home.

student athletes have reduced privacy expectations because of the schools' "custodial and tutelary responsibility for children," the "element of communal undress inherent in athletic participation" and because student athletes "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." 515 U.S. at 656-57 (internal quotation marks and citations omitted). Although the Court cited *Griffin* when it stated that "the legitimacy of certain privacy expectations vis-à-vis the State *may* depend upon the individual's legal relationship with the State," *Vernonia*, 515 U.S. at 654 (emphasis added), it also emphasized that "the fact that the [students] are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster" was "[c]entral" to its holding. *Id.* Whatever legal relationship exists between the fraud investigator and the welfare applicant is wholly distinguishable from the relationship between a student and school administrators, *id.* at 656-57, a probationer and his probation officer, *Griffin*, 483 U.S. at 874-75, or the government as employer and its employees, *Von Raab*, 489 U.S. at 670-71. Moreover, *Vernonia* confirmed that the legitimacy of a person's subjective expectation of privacy "varies . . . with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car or in a public park." 515 U.S. at 654.

With the exception of convicted felons, neither we nor the Supreme Court has ever held that an individual's privacy expectation *in the home* was reduced to a level of unreasonableness as a result of their relationship with the state. But the majority today concludes that "it is reasonable for welfare applicants who desire direct cash governmental aid to undergo eligibility verification through home visits." Maj. Op. at 11517. Even if that broad statement is true, it does not follow that it is reasonable for a fraud investigator to conduct an intrusive walk-through of the home and look through its most private locations in search of evidence of welfare fraud, particularly if the applicant had no knowledge of the scope of the

visit in the first place. I do not disagree that the Fourth Amendment permits some degree of intrusion in the home to *verify welfare eligibility*, so long as it is truly comparable to the limited home visit interview program at issue in *Wyman*. But walk-throughs and fraud investigations of the sort conducted here far exceed what is permissible. Society, I should think, is willing to recognize as reasonable a welfare applicant's privacy expectation that the most intimate locations of the home will be free from the government's prying eyes, even when he or she consents to a vaguely described home visit to "verify" or "check" information provided in an application for welfare benefits. *See Kyllo*, 533 U.S. at 27. Thus, notwithstanding the welfare applicant's need for government aid, his or her relationship with the state falls far short of reducing the expectation of privacy in the home.[12] *See also Scott*, 450 F.3d at 872 (distinguishing *Griffin* to hold that to the extent a pre-trial releasee's assent to warrantless searches "decreased his reasonable expectation of privacy . . . the decrease was insufficient to eliminate his expectation of privacy in his home").

The majority next concludes that the intrusion on privacy is also "reduced" as a result of the procedures used in conducting the home visit and because the applicant must consent to it. Of course, the cost to the applicant of refusing consent is a denial of welfare benefits, and we have rejected the notion that the waiver of constitutional rights in exchange for gov-

---

[12]The majority's conclusion to the contrary seems limitless and risks eroding the Fourth Amendment rights of various groups of people in this country. The government is a provider of countless benefits and services, many of which require verification of eligibility — such as disability benefits, Medicare and Medicaid benefits, veterans benefits, student financial aid grants and lunch subsidies for school students. If the majority is correct that a person's expectation of privacy in the home is reduced any time he or she has a relationship with the state that requires an eligibility determination, then there seems little to prevent the government from implementing a home visit program similar to Project 100% with respect to these beneficiaries as well.

ernment benefits is always permissible. *Scott*, 450 F.3d at 866 (stating that "our constitutional law has not adopted this philosophy wholesale"). "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary:

> [W]e live in an age when government influence and control are pervasive in many aspects of our daily lives. Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections. Where a constitutional right "functions to preserve spheres of autonomy . . . [u]nconstitutional conditions doctrine protects that [sphere] by preventing governmental end-runs around the barriers to direct commands."

*Id*. (quoting Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1492 (1989)).[13] The question here is whether the applicant's option to withdraw his or her consent and terminate the visit permissibly serves to reduce the nature of the intrusion on the applicant's privacy.

---

[13]As the majority notes, Maj. Op. at 11517 n.15, *Scott* cited *Wyman* in dictum for the proposition that "government may sometimes condition benefits on waiver of Fourth Amendment rights — for instance when . . . paying welfare benefits." *Scott*, 450 F.3d at 868. However, as shown above, *Wyman* did not permit the wholesale conditioning of welfare benefits on waiver of Fourth Amendment rights *any time* the government pays them. Rather, *Wyman* held that the home visits "*as structured by the New York statutes and regulations*" did not amount to an "unwarranted invasion of personal privacy." 400 U.S. at 326 (emphasis added). Neither *Wyman* nor *Scott* forecloses the conclusion that the Project 100% home visits are unconstitutional even though consent is given. Instead, "consent to any search is valid only if the search in question (taking the fact of consent into account) was reasonable." *Scott*, 450 F.3d at 868.

In the context of welfare benefits, where government aid is an important means of providing food, shelter and clothing to a family, the coercive nature of the home visit renders the notion of consent effectively meaningless. Although *Wyman* stated that "nothing of constitutional magnitude is involved" when a welfare aid recipient's benefits are terminated as a consequence of the plaintiff's refusal to undergo a home visit, 400 U.S. at 324, the Court there was not faced with a situation in which coercion may have played a role. Indeed, *Wyman*'s statement that the plaintiff's "choice is entirely hers" suggests that the Court did not believe coercion was an issue at all. *Id.* Yet the Court has made clear since *Wyman* that the Fourth Amendment requires that consensual searches be voluntary and uncoerced. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222-27 (1973). Under the circumstances of this case, one cannot reasonably expect an individual who has made the difficult — and often desperate — decision to apply for welfare aid to then deny consent to a mandatory home visit when the consequence is denial of the application. Where such coercion is present, the option to refuse the home visit or the walkthrough cannot reduce the intrusion on the applicant's privacy any more than it can reduce the applicant's privacy expectation in the home.

The majority finally concludes that the visits are "an effective method of verifying eligibility for benefits" and "provide an important deterrent effect." Maj. Op. at 11518. Even assuming that to be true — a point the Appellants dispute — and given that warrantless searches of the home are "presumptively unreasonable," *Payton*, 445 U.S. at 586, I cannot agree that these interests are "important enough to override the individual's acknowledged privacy interest" in the home or are "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion," *Chandler*, 520 U.S. at 318. "[T]he Fourth Amendment draws a firm line at the entrance to the house," *Kyllo*, 533 U.S. at 40 (internal quotation marks omitted), and the County's home visits unreasonably cross it. Absent probable cause or at least a rea-

sonable suspicion to believe an applicant has been less than truthful in his or her application, the Fourth Amendment prohibits the Project 100% home visits as they are conducted in this case. The majority errs in validating them as reasonable under the special needs doctrine.

## III.

Because the home visits are unreasonable under the Fourth Amendment, they also violate the California constitutional right against unreasonable searches and the right to privacy. *See Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 650 (Cal. 1994) ("Under the Fourth Amendment and the parallel search and seizure clause of the California Constitution (art. I, § 13), the reasonableness of particular searches and seizures is determined by a general balancing test weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty." (internal quotation marks omitted)); *In re York*, 892 P.2d 804, 813 (Cal. 1995) (observing that the Article I § 1 privacy clause of the California Constitution does not establish broader protection than that provided by the Fourth Amendment or Article I § 13 of the California Constitution).

In addition, the Project 100% home visits violate the California unconstitutional conditions doctrine, for two reasons. First, the County has not established that the value to the public of its unreasonable home visit program "manifestly outweighs" the impairment of the welfare applicants' constitutional rights. *See Robbins v. Superior Court*, 695 P.2d 695, 704 (Cal. 1985). Second, the County has not shown that "there are no available alternative means that could maintain the integrity of the benefits program without severely restricting a constitutional right." Id.

The majority avoids this analysis altogether, reasoning that the County has not conditioned the receipt of welfare benefits

upon the waiver of a constitutional right, because the home visits are reasonable, and the California and federal constitutions only create a right to be free from *unreasonable* searches. Maj. Op. at 11523. Of course, the majority's reasonableness holding is based in large part on its faith in the fraud investigators obtaining consent before entering the home or looking within it. But as I have explained, given the coercive nature of the home visit, the applicant's consent should not weigh in favor of holding the visit reasonable.

Project 100% clearly makes the price of welfare assistance the waiver of both federal and state constitutional rights, with consent being coerced by the threat of denial of benefits. This is precisely the sort of conditioning of benefits that California's unconstitutional conditions doctrine forbids.[14]

## IV.

In *Scott*, we held that police may not conduct a search based on less than probable cause of an individual released while awaiting trial. The majority has tried to explain why those in need of public assistance to provide food, shelter and medical care for themselves and their families have less protection under the Fourth Amendment than those charged with a crime. I am not convinced.

*Wyman* does not support the majority's unprecedented conclusion that no search occurs under the Fourth Amendment when a district attorney fraud investigator roams through a welfare applicant's home, scrutinizing the most intimate and private of places, looking for evidence of ineligibility, fraud and crimes wholly unrelated to the welfare application. Because the County's home visits violate the Fourth Amend-

---

[14]I agree with the majority that MPP § 20-007.33, the regulation prohibiting "[m]ass or indiscriminate home visits," applies only to Special Investigative Units conducting for-cause investigations and therefore does not apply to this case.

ment under both *Wyman* and the special needs cases, they also violate the California right against unreasonable searches, the right to privacy and the unconstitutional conditions doctrine. Although I concur in the majority's holding that the state regulation prohibiting "[m]ass and indiscriminate home visits" is inapplicable to Project 100%, *see* MPP § 20-007.33, I respectfully dissent from the remainder of the majority's opinion.